## Goersen *versus* Commonwealth.

106 477
32 SC ¹245
106 477
f218 ¹ 10

1. Upon the trial of an indictment for murder, evidence of the commission of a different and distinct crime by the prisoner is admissible for certain purposes, to wit, to show guilty knowledge and purpose, and to rebut any inference of mistake, and to connect the distinct offence with the one charged as part of the same object to be attained.

2. A prisoner being on trial for the alleged murder of his wife, by poisoning her with arsenic, the prosecution offered to prove that the prisoner's wife's mother had died a few days before the wife's death, from the effects of arsenic administered by the prisoner while prescribing for her during illness (the prisoner being a physician), and while she was residing with the prisoner and his wife; that the arsenic thus administered was of the same description as that found in the stomach of the wife; that both were so poisoned in pursuance of a design by the prisoner to obtain the property of his wife and her mother; to show the purpose and intent of the prisoner and the system adopted to accomplish the same; and also to rebut the theory that the death of the prisoner's wife was the result of accident or suicide, or of the negligent or ignorant use or administration of arsenic, either by the deceased or the prisoner.

   *Held*, that the court properly admitted said offer of evidence, and that the testimony given under said offer was properly submitted to the jury and commented on in the charge of the court.

3. Goersen *v.* Commonwealth, 3 Out., 388, approved and followed.

4. Declarations of a prisoner, not part of the *res gestæ* of a transaction in evidence, are not admissible in his own favor.

5. A witness examined on behalf of the prisoner may be cross-examined to ascertain if he had not made statements inconsistent with the general tenor and effect of his testimony in chief, for the purpose of affecting his credit and veracity.

6. An offer to prove that ten years previous to the alleged poisoning by arsenic, the deceased had been known to take arsenic medicinally, may be admissible on behalf of the prisoner, if accompanied by an offer to follow it with other testimony to prove such act or habit within any reasonable period before the death; but unaccompanied by such supplemental offer, it is inadmissible.

7. The evidence in this case was sufficient, if believed, to disclose the essential ingredients of murder in the first degree.

8. Upon a trial for murder, after the case had been given to the jury, and during their deliberation thereon, one of the jurors was taken suddenly ill at night in the jury room; the foreman of the jury, fearing the juror would die, summoned the court officers in charge of the jury, who brought in the coroner's physician, and admitted him into a room adjoining and communicating by an open door with the jury room, where the sick juror had been put to bed, and the physician there attended him professionally in presence of the court officer. The evidence taken before the court established that the case was urgent, and that the communication between the physician and the juror related exclusively to his illness and medical treatment, and that the physician did not speak to the other jurors. The juror recovered, and the jury found a verdict of guilty. The above facts being assigned for error, on the ground that it was the prisoner's constitutional right to have a trial by an impartial jury, without separation or communication with outsiders:

*Held,* that conceding the attendance of the physician without the knowledge and order of the court was wrong, and gave rise to a presumption which the prosecution was bound to remove, yet the evidence taken by the court was ample to rebut such presumption, and that no such separation of the jury was shown as to establish any misconduct, or to deprive the prisoner of any constitutional right.

May 2, 1884. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ. CLARK, J., absent.

ERROR to the Court of Oyer and Terminer of *Philadelphia county:* Of January Term, 1884, No. 185.

Indictment of Albert G. F. Goersen, for the murder in the first degree of Elizabeth E. Goersen, his wife. Plea, not guilty.

The indictment was first tried in 1881, when the prisoner was convicted, but upon writ of error the judgment was reversed, and a venire facias de novo awarded: See Goersen *v.* Commonwealth, 3 Out., 388.

Upon the second trial, before LUDLOW, P. J., the evidence was, in the main, similar to that given on the former trial. As recited in the charge of the court (to which no exception was taken by either party) the material facts and evidence on this trial were as follows:

There are a number of facts in this case, not seriously disputed, to which we briefly refer. The prisoner, a physician by profession, lived in the house of one Elizabeth F. Souder, No. 255 East Cumberland street, in this city. In that house also resided a lady, the daughter of Mrs. Souder, whose name

was Elizabeth E. Souder. In April, 1879, the prisoner married this lady, and thereafter appears to have lived with her in that house.

On the 30th of March, 1880, late in the day, Mrs. Goersen became sick. This illness appears to have continued until the following Saturday night or Sunday morning, when she died. It may also be stated as a general fact in this cause that the mother of Mrs. Goersen, Mrs. Souder, was somewhat sick as early as January, 1880, and was being treated by the father of the prisoner, also a physician, until some time in March, 1880, when, he having died, the prisoner assumed the charge of the case. Mrs. Souder became very ill, and subsequently, on the 25th of March, 1880, died. Both of these ladies executed wills, and to these and their contents I will hereafter call your attention.

The Judge then instructed the jury fully upon questions of law, and he reviewed the evidence on both sides as follows:

As the presumption of law always is that a prisoner is innocent, the Commonwealth must affirmatively establish every point in the cause, beyond a reasonable doubt, and therefore in this case, the Commonwealth's officers proceed to prove, as they allege, the following facts:

(1) That Elizabeth E. Goersen is in fact dead. Although this fact is not seriously denied, yet the Commonwealth has proved by the evidence of Dr. John G. Lee, the coroner's physician, that he made a post mortem upon the body of a female on the 5th day of April, 1880, which body was identified by Joseph A. Souder as the body of Mrs. Elizabeth E. Goersen. If you believe these witnesses, we must proceed to consider (2) the evidence by which the vital fact is sought to be established that a deadly poison was found in the body. Dr. Lee testified that, with what appears to be reasonable caution, he took portions of the body of Mrs. Goersen and delivered them to an expert chemist, Dr. Henry Leffman. This witness swears that he subjected the contents of the stomach and a portion of the liver to seven distinct tests, and produced and exhibited to you the result of his experiment. In each there appeared a drug commonly known as arsenic.

I think it unnecessary to go further into detail upon this branch of the case, but I call upon you to remember the explanation made of each of these tests, together with the cross-examination of the witness by the prisoner's counsel.

Indeed, the defence of the prisoner, so far as the death of Mrs. Goersen is concerned, does not seem to rest upon a denial of the presence of this drug in these remains and in this body, although the fact must be proved. Having thus, as is argued by the Commonwealth's officers, established the death,

and that deadly poison was found in the body, the prosecution proceed (3) to establish another most vital fact, to wit, that this poison produced this death. Both of the physicians declare that the arsenic found was administered in sufficient quantities to produce death, and that it did so produce the death of Mrs. Goersen.

Both of the physicians testify to this fact, and both were subjected to searching cross-examination, the object being to show that other diseases might have produced death, and that the tests applied only to the presence of a poisonous drug, while other poisons arising from the diseased condition of the liver, and especially the kidneys, might account for the death. I leave all this evidence for your consideration, with the remark that the commonwealth must establish the fact that Mrs. Goersen was poisoned and died from the effect of poison by arsenic. If you do not so believe, there is an end of this case.

(4) If you are satisfied of the fact of this death, and that it was produced by arsenic, you must now proceed to determine whether it was accidental or caused by self-murder; that is, was it a case of *suicide*, or was it a murder committed by this prisoner. I shall have something to say hereafter concerning the first two causes of death referred to, when I come to consider the evidence for the prisoner. At the present time your attention will be directed to the evidence against the prisoner, wherein the commonwealth seeks to establish a motive for the deed, and such conduct and declarations of the prisoner as fix, it is contended, beyond question or doubt, upon him, and upon him alone, the commission of the crime. . . . . . What, then, is the motive which it is alleged urged on the prisoner to commit this crime, if he did commit it?

The theory of the commonwealth is that he desired to obtain possession of certain property, and to accomplish this purpose, it was necessary not only to destroy his wife, but her mother also.

To establish this proposition, a deed is produced, intended to prove that the house No. 255 East Cumberland Street, was conveyed, on the 29th day of September, 1874, to Lizzie E. Souder, afterwards Mrs. E. F. Goersen. In addition to this, evidence is produced to prove that, although the legal title is vested in Mrs. Goersen, under a family arrangement, her father had an equitable interest in the property. The will of the father is then placed in evidence, dated 24th day of November, 1876, showing what disposition he made of any estate he might possess, and this is followed by the production of the will of Mrs. Souder, dated 8th day of March, 1880, and of Mrs. Goersen, the wife of the prisoner, dated 2d day of April,

[Goersen v. Commonwealth.]

1880. All of which evidence, it is argued, establishes the fact that certain property would devolve upon Mrs. Goersen, who, by her last will and testament, devised and bequeathed the whole to her husband, the prisoner.

I will here remark, with reference to this testimony, that the exact interest of Mr. Souder in the real estate does not appear, the evidence being that he contributed toward its purchase, but that Mrs. Goersen owned the greater portion thereof.

It does not appear that Mrs. Souder had any other interest in the real estate, except possibly that which might arise under a possible construction of her husband's will, and which amounted to a small contingent equitable interest. In any event, it was but a slight interest, limited to her life.

Mrs. Souder did, undoubtedly, own some personal property, which was situated in the house in which the deceased died, and which Joseph A. Souder testified the deceased wife (upon some dispute arising between witness and Mrs. Goersen shortly before Mrs. Goersen's death) declared that her " mother gave to her the remainder of the things in the house," and which with the interest Mrs. Goersen possessed, really passed to the prisoner under his wife's will. I will refer hereafter to the view which the prisoner's counsel take of this evidence.

Having submitted this evidence, the commonwealth now proceeds to show that the conduct and declarations of the prisoner all point to the prisoner as the guilty author of this crime. In the order of time, evidence is produced to show that as early as March 25, 1880, Mrs. Souder, the mother-in-law of the prisoner, died; she had been sick for some months. On the 13th of April, 1880, her body was taken from the grave, and a post-mortem examination made.

The son of the deceased and another witness both identify the body. She had been treated by the prisoner subsequent to the death of his father. Portions of her remains were given by the coroner's physician, Dr. Lee, to the expert chemist, Dr. Leffman; these remains were subjected to the same seven tests which had been applied in the examination of Mrs. Goersen's remains, and the same results followed, with the additional discovery of crude arsenic in the stomach, which was washed out by a proper process, and the result exhibited to you in court by the production of the identical arsenic then found.

Unless desired by the jury, I will not recapitulate the testimony of these physicians upon the subject matter of their investigations, except to call your attention to the vital fact that both agreed that the post-mortem developed facts from which the opinion was formed, and expressly stated that Mrs. Souder

10' OUTERBRIDGE.—31.

died from the effect of poison by arsenic. The defendant's counsel cross-examined these witnesses at great length, the object being to prove that other causes might have produced this death, especially as to Mrs. Souder's case, whose death, it is argued, might have been accidental, and that the tests applied to her remains had not exhausted the subject: and it was also argued that Mrs. Souder might have incautiously taken an imperfectly made dose of homœopathic arsenic, not properly mixed; while I may as well state here as elsewhere . that Dr. Korndoerfer was called by the prisoner to prove, first, that for a disease such as Mrs. Souder suffered from, she might be treated with *arsenicum*, and then described the character of that drug, its strength and course of manufacture, as practised by homœopathic physicians. I leave this testimony as a whole to your consideration, remarking that if you are not satisfied that Mrs. Souder died from the effect of arsenical poison, an important link in the chain of evidence drops out of the case.

Coming closer to the date of the death of Mrs. Goersen, evidence is produced to prove what Dr. Goersen actually did while attending his wife in her last illness. The most important evidence upon this point, and of the condition of Mrs. Goersen to the time of her death, is contained in the testimony of Miss Sarah E. Souder, and it is so important that I will read extracts from it for your information. (Reads from notes of evidence.) In so far as the testimony of this witness in relation to the tumbler of medicine is concerned, it is corroborated by the evidence of Mrs. Eliza Wallace and her daughter, Susan L. McVaugh, who declare that the one observed two tumblers of medicine, and the other that one tumbler contained a clear liquid, and the other something mixed up like magnesia, and white. Dr. John R. Haynes testifies that he was called to see Mrs. Goersen on Friday, April 2, 1880. Dr. Goersen himself called at the house of a brother of this witness, and then met the witness; he accompanied him to his residence, and there saw the sick woman, Mrs. Goersen. The doctor inquired of the condition of the patient, when he was interrupted by the prisoner with the remark that "two weeks before she had taken cold, and had had diarrhœa." The statement was also made to Mrs. Lambson that Mrs. Goersen had taken cold at her mother's funeral. The patient was very ill, and her condition was fully described by the physician. A nurse was ordered, a certain prescription left, containing one grain of morphine, turpentine ordered, and other remedies. The turpentine was never administered as directed, nor do I remember any evidence of the administration of the other remedies, except that the prescription was

obtained. (Reads evidence of Dr. F. L. Haynes and Dr. R. W. Haynes.)

In addition to the above alleged evidences of indifference, disregard of obvious duties, and the implied administration of a poison, evidence is presented, intended to prove that an effort was made to obtain a death certificate, without which the body could not be buried, and that afterwards, when an' effort was made by the physician whose certificate it purported to be, to obtain it, it was not to be found, and was concealed by the prisoner.

The first appearance in order of time of this alleged desire to obtain this certificate appears in the evidence of Dr. John R. Haynes, who declares that when he saw the prisoner first, at or near his brother's office, and as Dr. Goerson and Dr. Haynes walked together to the house of Dr. Goerson, the doctor remarked, " I do not think it would be the correct thing to give a certificate in the case of one's own wife's death." To which Dr. Haynes replied, decidedly not, etc., etc. Over the body of his wife, the witness declares that the doctor, after, among other things, objecting to the turpentine cloths, almost in the same breath " asked me if, in case of death, I would give a certificate." " I, attributing it to his semi-intoxicated condition, replied yes," says the witness, " in order that he might not repeat the question." After the death of Mrs. Goersen, Dr. Francis L. Haynes declares Dr. Goerson called and asked him " at least six times for the certificate." This request was refused, when the prisoner turned and remarked, " I'll get it from your brother."

A certificate, signed with the name of Dr. John R. Haynes, was subsequently obtained, containing the name of " Lizzie. E. Goersen; date of death April 4th; cause of death, gastritis." Raymond Steinecke declares that his cousin, the prisoner, sent him to Dr. John Haynes for the certificate, giving him a card with something written on it, which he did not read, and which Dr. Goerson wrote. This witness saw the housekeeper of Dr. John R. Haynes, Elizabeth Slack, who signed that name J. R. H., to the certificate, gave it to the witness, who handed it to Dr. Goersen. Sarah E. Souder states that this certificate was handed to Dr. Goersen by Raymond Steinecke, and that the doctor put it in his pocket. Mrs. Margaret Lambson declares the " doctor seemed to be glad when the messenger brought the death certificate; " he said, when it was given to him, " good; I can now put her away without any trouble, as I have two, one of my own and one from Dr. Haynes." When William B. Scull, the carriage driver of Dr. Haynes, was sent for the certificate, he declares the following took place: (Testimony of William B. Scull

read.) Sarah E. Souder testifies that when the boy came for this certificate the prisoner told her "he was lying on the sofa, pretended to be asleep, and hid the certificate in the sofa."

When a post-mortem of the body of Mrs. Goersen was suggested by his mother, he said, "it would cost money." And when his mother replied, "it makes no difference; I am able to pay it, and it will stop people's talk," he answered, "all right."

It is also contended by the commonwealth that the prisoner and his wife did not live happily together, and Mrs. Mary M. Pierson is produced to prove the fact that, on one occasion at least, a conflict occurred, and that she heard loud and angry voices, and that "she cried, let me out; he struck her, for I heard the blow; there was a fall, and something struck the .coal scuttle." This witness is in part corroborated by her mother. . . . .

As a final exclusion of a conclusion, the commonwealth calls a number of witnesses, said to include every person who visited the house certainly from Tuesday evening to the date of the death, to prove that no one of these administered arsenic in any form to the deceased; while the medicine chest of the prisoner, on being examined, did not contain the arsenic bottles, the prisoner explaining that he had taken them out to get them filled, or some such excuse.

The commonwealth's officers argue that a perfect chain of evidence has been established, every link of which has been proved by independent and competent testimony, each fact being consistent with every other, and with the main fact sought to be established; that the inferences to be drawn are natural, reasonable, and to a moral certainty certain, and above and beyond all that the theory of the guilt of this prisoner excludes every reasonable and fair hypothesis or theory of his innocence. Thus establishing a complete chain of evidence, based strictly upon the severest tests which can be .applied to circumstantial evidence.

What answer does the prisoner make to this grave charge? His defence, in addition to the efforts made by his counsel to shake the force of the evidence of the commonwealth by.cross-examination, and thus to attack its truthfulness, and after an extended argument intended to overthrow the theory of motive, by proof that the interest in the property of the father was nothing of practical value; that Mrs. Souder might have died from an improperly mixed dose of arsenic, if that drug killed her at all; that the property bequeathed and devised to Mrs. Goerson, by her mother, was so insignificant as to amount to nothing and by additional proof that after his father's

death the prisoner was in receipt of certainly an income of from $20 to $40 a week, and was therefore able to sustain himself; also endeavors to establish his innocence in various methods.

(1st.) It is contended that a number of the commonwealth's witnesses have been directly contradicted in material points.

*a.* As to the direction to obtain a death certificate for Mrs. Souder, a witness, Nicholas Biesiegel declared that he heard Mrs. Goersen herself direct, "Albert you had better go for a doctor; my mother is very sick, and in case she dies you cannot give a certificate." This occurred early in March, you will remember, before, of course, the death of Mrs. Souder, and a length of time before Mrs. Goersen died.

*b.* While the evidence concerning the method by which Dr. Goersen obtained Dr. Haynes' certificate of his wife's death has not been disputed, a contest arises as to the method in which the commonwealth contends it was afterwards secreted, Sarah E. Souder stating that the doctor informed her he pretended to be asleep when the messenger came for it. And Mr. Buckner, that "I think he told me it was in the sofa back; don't recollect if he said he did do it or not." The mother of the prisoner declares that, "when the boy came for the certificate, Albert was asleep; I looked for the paper in his pocket, but could not find it; I did not wake up Albert, but told the boy to call again in the morning." Nettie Miller also says, "yes, I remember the boy coming for certificate; he was lying asleep; we thought he was."

So, also, an effort was made to contradict Sadie Souder in relation to the doctor being present on Friday in the sick-room, but on cross-examination, or on being recalled, she corrected her statement. Again, a witness for the commonwealth having testified that, upon the delivery of the certificate of Mrs. Goersen's death, the prisoner, with certain manifestations, exhibited by the witness, Mrs. Lambson, on the stand, by gestures declared, "good; I can now put her away without any trouble, as I have two, one of my own and the other of Dr. Haynes." The defence called the mother of the prisoner to prove that this was not the case. She says: I was present when R. Steinecke returned with the certificate; he said, here is the certificate; he wrapped it up and put it in his pocket; he did not say 'good;' he did not say such a thing." Raymond Steinecke, being also called, said that when he gave him the certificate he put it in his pocket, and did not say good; he made no remark at all.

These are the chief contradictions upon this point; there may be others which do not occur to me, but you must weigh each and all, and you must remember what each said on cross-

examination, in so far as it is possible, the effort being to arrive at the truth by a comparison of the statements made, the time fixed, the persons present, and the manner of each witness under examination.

*c.* Another apparent contradiction arises out of the conduct of the prisoner in relation to the necessity for a *post-mortem.* Sadie E. Souder testified, in substance, that the prisoner said to her, " I should go to my Uncle Charley's and tell him *not* to notify the coroner. The prisoner's mother had that afternoon said it was best to notify the coroner; I told him it was too late, and he said 'all right.'" Mrs. Goersen, mother of the prisoner, upon this point says: "Neighbors came and told me what was said; I told my son that if he was clear of that what they say, they should send for the coroner; he said 'all right, I should send for him.'" Dr. Lee, upon cross-examination, had said that the prisoner had remarked to him, " I don't wish it done. He shed tears, and seemed to regret his wife's loss. . . . . ."

*d.* Another and minor contradiction as to what Mrs. Goersen had eaten on the Tuesday when she was taken sick. Mrs. Goersen declares that she did not eat peaches. Sallie Souder, I think, says she did, but afterwards stated, " I think I made a mistake." So a student in Mr. Randall's office, who took notes at the former trial, testifies that Dr. F. Haynes did say that Dr. Goersen was in a semi-intoxicated condition when he saw him during the week of his wife's death. The doctor had said upon this trial that he did not remember saying Dr. Goersen was in a semi-intoxicated condition, and added, " to the best of my recollection he was sober."

Upon these several points of contradiction, and upon any others which may occur to you, I again repeat, you must weigh all this evidence upon both sides, upon the principles heretofore stated, and, in so far as they are at all material, determine where the truth lies.

(2d.) The second branch of this defence is the existence of arsenic under the control of the deceased, a tendency to great depression of spirit, which, accompanied by proof of an attempt to take poison, would lead to a theory of death caused *by suicide.* Just at this point I remark that, assuming as proved the fact that this death resulted from arsenical poison, a fact to be found by the jury, I do not find in this evidence a particle of proof (although that fact is for the jury to determine) that this death resulted from a pure accident. If Mrs. Goersen swallowed the poison, it must have been either because it was self-administered, recklessly administered, or deliberately given by some one.

The defence, to establish the fact that Mrs. Goersen had

possession of the deadly drug, and attempted to use it, calls a witness, Mr. Frank H. Honig, whose evidence I will read. (Honig's evidence read.) The jury will remember, I am sure, the searching cross-examination of this witness, wherein he stated how he had been mistaken in certain points, especially in regard to time, and, generally, the effort of the district attorney to shake the credit of the witness.

There is no exact evidence of·what this bottle contained, other than the cross-bones and skull, and a color; nor, indeed, is there evidence of the kind of medicine she ·took from the closet, if it were so taken. So, also, to the same effect, is the evidence of Mrs. Getz, the old lady examined yesterday, and who described the box and bottle, the cross-bones and skull, and who was subjected to a severe cross-examination, the result of which and of her testimony is for you.

If the jury believe the witness, how far does that fact, coupled with others in a moment to be mentioned, tend to establish the theory of suicide? That is the vital question upon this branch of the case, and the jury must decide it. To throw light on this subject, evidence was produced, intended to establish, I take it, a suicidal intent upon the part of Mrs. Goersen. What is this evidence?

That Mrs. Goersen was distressed by her mother's death seems to be both true and natural. How does the evidence establish anything beyond this? Let us look fairly at it. To Sallie Souder she said, "I will soon follow your grandmother." And to her husband, "Albert, we will plant flowers on mother's grave this summer." At home she took certain letters from the second-story room (which appear to have belonged to her mother) and destroyed them. She gave certain articles to the witness, Sallie Souder, and also to another woman, and the ear-rings to Sallie after her death. On cross-examination this witness said "she was going in black, and would not need them any more." When Mr. Krein drew the will, among other things she said, "You don't know what may happen; better have it done with." To Harriet R. Kendle she said, "It matters but little; I won't be long here anyhow." To the undertaker, Mr. Horsch, she said "she would not live long after her poor mother, anyhow. . . . . ."

(3d.) The third branch of this defence consists in the production of evidence intended to prove, in opposition to the proof and theory of the commonwealth, that Dr. Goersen lived pleasantly with his wife, and treated her with that kindness and consideration which is always due to a woman so situated, and that the will finally made by her was an additional proof of her affectionate regard for him.

Turning first to the last point named in the above sentence,

[Goersen *v.* Commonwealth.]

I call your attention to the evidence of the witness, Charles B. Krein, who narrates what occurred at the time of the directions given for, and the actual execution of the will. (Evidence of Krein read.) In addition to this, a number of witnesses are called, who swear to the fact that the doctor treated his wife kindly. Among these witnesses I name the following: Bertha Goersen, who says, "I never heard her complain to anybody of his ill-treatment." John and R. Steinecke: "He treated his wife kindly and affectionately." To the same effect is the evidence of Frank H. Honig, Nicholas Beisiegel, Mrs. Lambson, I think his mother, also, and possibly others, whose names may have escaped my notice.

Two witnesses are also produced to rebut the theory of the commonwealth on this point, and who say, subject to cross-examination, that one of them did not see marks and bruises, and the other that they did not exist on her, Mrs. Goersen's, person. Louisa Rotheimer declares he always treated her good. "Albert took her around the neck and hugged her, right after the marriage; he showed love to her."

(4th.) The fourth and last point of defence to which I refer is that of intoxication. As a general principle, voluntary intoxication is no excuse for crime. In a case of this nature, it sometimes reduces the grade of the offence. Where one drinks until his condition is such that he is attacked with a disease called "delirium tremens," he is not a responsible being—he is truly insane. So where, by the long-continued use of liquor, a human being approaches a condition of idiocy, with a mind so weakened as to be unable to form a design to take life, or to understand the nature and character of his own acts, and cannot distinguish between right and wrong, he is not a responsible being. These are general conditions of the mind, produced by long-continued abuse, and ending in a practical overthrow of the reasoning powers. From whatever cause this condition of things exists, the law is that a human being reduced to a condition which renders him like an insane man or an idiot, is rather an object of pity than the subject for punishment.

But the law has never declared that a man may nerve himself by the voluntary use of liquor so that he may kill another, or that by the like voluntary use of liquor, without a specific intent, he may put himself in a condition to do any reckless act, and then claim to be excused because of his intoxication.

In the first instance above named the crime would be murder of the first degree, and in the second instance, murder of the second degree. This distinction arises because of the benevolent provisions of our Act of Assembly.

To constitute murder of the first degree there must be a

" wilful, deliberate, and premeditated" intent to kill. And although death by poison is declared to be murder in the first degree, yet it is evident that unless it is administered with an intent to kill, that is, with a wicked and malevolent purpose, the crime is not murder of the first degree. As where it is so administered by accident, mistake, or without what may be called an immediate criminal intent, but with a recklessness begotten of mental imbecility produced by liquor, and which deprives its victim of the power of forming a deliberate intent. " Where this ingredient is absent, where the mind, from intoxication or any other cause, is deprived of its power to form a design with deliberation and premeditation, the offence is stripped of the malignant feature required by the statute to place it on the list of capital crimes;" and neither courts nor juries can dispense with what the statute plainly requires.

If a prisoner, for the express purpose of committing the crime, drinks to intoxication, or if, without an express purpose, and notwithstanding his condition produced by drink, he had a knowledge of right and wrong, a power of discrimination and judgment, knew his moral obligations and his relations to others, and with wilful deliberation administered poison, with a knowledge of its deadly character, he is clearly guilty of murder of the first degree.

If without wilful premeditation and deliberation, he wantonly and recklessly administered a drug, the effect of which was to kill, the offence would be murder of the second degree.

The result of our deliberations may be summed up as follows: Wherever a person has sufficient mental capacity to distinguish right from wrong, to understand and appreciate what he does, and to judge of the probable consequences of his acts, the law holds him criminally responsible for them, although (from drink) he may in some respects be weak minded—the degree of criminality (murder of the first or second degree) depending upon the judgment the jury pronounce upon the evidence on the question of the power to form a wilful, deliberate, and premeditated design. Of course, if the jury find such a condition of the mind to exist as to destroy capacity to distinguish between right and wrong, or which disables a prisoner from understanding the nature and character of his act, and its probable and ordinary consequences, the law will not hold him criminally responsible for them.

The evidence upon this branch of the case establishes the fact that the prisoner was undoubtedly a drinking man; even the commonwealth's witnesses declare that they observed the prisoner while under the influence of liquor at times. Dr. J. R. Haynes speaks of him, at the bedside of his wife, as semi-

intoxicated; and, on cross-examination, "like a man under the influence of opium." Dr. F. L. Haynes said, "I did not smell his breath, but he walked naturally. I saw no indications of drunkenness, but I can't swear he was sober." I. Hampton Moore was afterwards called to contradict this witness, and said, "that at the last trial, the doctor had said the prisoner was in a semi-intoxicated condition during the night of his wife's death."

Mrs. Lambson says, "he was under the influence of liquor on Friday night, and had drink in him on Sunday." John F. Hyde declares, when he saw him, "he seemed to have been drinking." And so also does Kerbaugh declare, when he said, "that when Goersen attempted to push them down stairs he was in liquor." In addition to this evidence the prisoner produces a number of witnesses to prove his intoxicated condition. Among others may be mentioned his mother, who says, "on Saturday I visited him in my son's house; I saw him in the afternoon, and he looked like a crazy man." Robert Adams declared, "I saw him a week before his wife died; he was pretty much under the influence of liquor; remember him on Friday night in my place; he got one or two drinks, and I refused him any more, because I thought he had enough." Bertha Goersen, the sister of the prisoner, said, "he was drinking during day and evening the week just before his wife's death." Nettie Miller says, "I saw Albert at his mother's occasionally. I did not know what to think of him, he acted so queer and noisy." She added again, "he drank a great deal," and then described the unlocking of a closet door, and the taking out of a bottle, a scene which, I think, the prisoner's mother had already described, or another very like it. Louisa Rotheimer also says, "he was always drunk;" while Louisa Ratzkey describes the occasion of his visit to her house on Friday before his wife died, when he prescribed medicine for her sick child, which, because of his condition, she refused to use and burned. And John Bowder declared "he was full all the time."

I thus review the testimony for the prisoner on this point, certainly as to most of the witnesses who testify upon the subject, and if I have omitted any, your memories will supply the unintentional omission.

The commonwealth answers this defence, not only by cross-examination of these witnesses, but by the production of witnesses, who describe their view of the actual condition of the prisoner during that week; one or two say he was sober; the commonwealth also point to his *acts*, and to his general conduct, both as a practitioner of medicine, from and immediately after his father's death up to the date of his wife's

death, and also to the fact that, notwithstanding this condition of intoxication, as is alleged, he was the active agent in producing two deaths, and not one only. And, it is argued, that a condition of mind which would either modify the degree of crime or reduce the prisoner to a state of mental imbecility, which would render him an irresponsible agent, ought to extend over and embrace the period of time, from before the death of Mrs. Souder, to that of his wife.

Under the principles heretofore stated, you will observe, if you believe the prisoner to have labored under any abnormal condition of mind produced by liquor, that the true point to determine is the extent of this condition.

Before concluding this review of testimony, I ought to call your attention to the evidence of the commonwealth in rebuttal, wherein Mrs. Getz was contradicted by Miss Souder, who declares she was not in Mrs. Goersen's house at the time she fixed in her testimony, and also to the evidence of the same witness and of Mrs. McVaugh, who, to affect the credit of the witness, Frank Honig, declares after the funeral, that he said to the first, "Al. has done this to get the money," and to the last, "if all had been right, they both would have been here yet."

I have thus, at some length, endeavored to place the vital points of this case, upon both sides, before you. It is too much to say that every particle of evidence has been referred to, but I venture to declare that every essential part of it, and each branch of the case, has been commented upon.

Verdict, guilty of murder in the first degree. The defendant moved for a new trial, for the following reason, among others:

1st. "The separation of the jury before verdict, and their misconduct in permitting a stranger to visit the jury room, and converse with one or more of the jurors."

The facts established, under oath, at the hearing of the argument upon this motion were these: On Sunday evening, during the recess of the court, a juror was taken suddenly very sick; his condition appeared to be serious; and, in great alarm, the foreman of the jury summoned the officers in charge, and requested them to obtain medical aid. One officer immediately went for a physician, and produced Dr. Cadwallader, one of the coroner's physicians, who, with the officer, went to the bedside of the patient, who had been placed in an adjoining room, and prescribed for him, and on Monday morning, about 9 A. M., again saw the juror, and again administered to his wants. Not a word on any subject was spoken to the

eleven other jurors, and not one word said by anybody to the sick juror, except about the condition of his health.

The court, in an opinion overruling the motion for a new trial, said, in reference to the above reason:

Possibly under the rigor of the ancient law something might be said in support of the reason assigned. When a juror had expressed any opinion upon a case, no matter though he swore that it would not affect his judgment, he could not be sworn; and if he knew nothing about the case, and was sworn, he was obliged to suffer imprisonment without "meat, drink, fire or candle;" and finally, if an agreement was not reached before the adjournment of the court for the term, he must follow the judge around his circuit, until, by a verdict, justice was satisfied, and the jury discharged.

When a case could be tried at one session of the court, there might be a reason for the rule, but now, when under our practice, notes of evidence must be taken of examinations and cross-examinations of witnesses, exceptions made and argued, and speeches be addressed to the jury, it is evident that the application of the rule would be absurd. Long ago, in the year 1822, our Supreme Court held that cases of absolute necessity might arise where the court might discharge a jury, even in a homicide case. Said TILGHMAN, C. J.: "There is, indeed, one principle which cannot be contradicted, and that is, that the jury may be discharged in cases of absolute necessity; but what constitutes that necessity has been ascertained only in the particular cases that have arisen:" Commonwealth *v.* Cook, 6 S. & R., 579. Commonwealth *v.* Clue, 3 Rawle, 497, follows the lead of the above cited case, and while the prisoner was in that cause discharged, it was because temporary exhaustion might have been relieved by appropriate nourishment. It is a curious fact that, in this very case, "a respectable physician" was ordered to visit the indisposed juror; it does not appear that he was sworn, and no objection whatever was taken to the visit.

In Peiffer *v.* Commonwealth, 3 H., 468, the jurors, under an agreement of counsel, did not only and actually separate, but went to their homes for days together.

My brother, ALLISON, P. J., speaking for the court of which I was a member, declared, that while separation of the jurors after they had been sworn in a capital case, will authorize the court to set aside a verdict, the separation must be clear and substantive: Commonwealth *v.* Thompson, 4 Phila. R., 215.

From an examination and study of these authorities, we may deduce the following principles, by which we must be guided:

A necessity may exist which is so overwhelming that the

court may actually *discharge* the jury, and remand a prisoner for another trial.

True, the case must be an extreme one, or the prisoner, by an improvident act of the court, may himself be discharged, and just because this is the law, *a fortiori*, a minor necessity may also exist which requires the court to attend to, and if possible, relieve the physical wants of a juror, because the necessity may become evident, and yet not such as would warrant a discharge of the jury. What this necessity may be depends entirely upon the facts of each case. If the court is in session, of course the presiding judge must be appealed to, and so, also, if he is within calling distance.

Suppose, however, upon a Sunday, the judge cannot reach the court room in less than half an hour, must a juror, apparently extremely sick (as in this case), die? A fit of indigestion may be rapidly relieved, but cases on record prove that it may also speedily prove fatal.

The true and common sense rule would seem to be, that the officers must at once act, subject to the general orders of the court, and also the necessity of the case. If it appears at any time that by mere negligence the thing was permitted, or by artifice an effort is made to circumvent justice, or that no necessity existed, or that, even in this last case, the juror or jurors, officers or physicians, conversed about the case on trial, the verdict should at once be set aside. I would also require, in every case, affirmative evidence, under oath, of every fact which would justify the interference of the officer and physician, the absence of any conversation, except concerning the health of the juror, and the presence of what at least appeared to be an overwhelming necessity.

Tested by these stringent rules, I am satisfied that nothing was done in this case which I would not have specially ordered if I had known of the facts, and that every material circumstance has been established in open court, by an oath, which justified the visit to the juror in the room in which he was confined in bed. I am not willing, for the cause assigned, to set aside this verdict. No legal separation took place, and there was no misconduct of a "stranger" in the jury room, and, what is more important, there is here no stretch of judicial authority, and no injustice whatever, in the slightest degree, done to the prisoner.

I shall, however, direct the reason filed, and all the evidence taken, to be affixed to the record, so that if the supreme tribunal sees fit to examine the point, every fact shall be before it, together with my judgment thereon.

Sentence of death was pronounced, whereupon the defend-

ant took this writ of error, and filed the following assignments of error:

1. The court below was in error in permitting the Commonwealth, under an offer made by the district-attorney, to introduce evidence of a separate and distinct offence from that for which the prisoner was on trial. [The offer was as follows: The Commonwealth proposes to show by the testimony of Dr. Lee and other witnesses that Mrs. Souder came to her death ·a few days before the death of Mrs. Goersen, by arsenic, administered by the prisoner while prescribing for her during an attack of illness, and while she was residing with the prisoner and his wife; that the arsenic administered to Mrs. Souder was of the same description as that found in the stomach of the prisoner's wife; that the poison was administered to Mrs. Souder and Mrs. Goersen in pursuance of a design on the part of the prisoner to obtain the property, real and personal, of Mrs. Souder and Mrs. Goersen, a portion of which was derived under the will of John F. Souder; to show the purpose and intent of the prisoner, and the system by which that purpose was to be accomplished, and the connection of the death of Mrs. Souder and Mrs. Goersen with the said purpose and intent, and also to rebut the theory that the death of Mrs. Goersen was the result of accident or suicide, or of the negligent or ignorant use or administration of arsenic, by either the deceased or the prisoner.]

2. In overruling the motion of prisoner's counsel to strike out all the testimony relating to the sickness and death of Mrs. Souder, as it did not come up to or meet the offer of the district-attorney, under which it was admitted.

3. In permitting the Commonwealth, for the alleged purpose of connecting the deaths of Mrs. Souder and Mrs. Goersen as part of a system or common purpose and thus to show *motive* for the crime on trial; to prove the existence of an equitable title in Mrs. Souder to the real estate owned by Mrs. Goersen under a secret parol agreement not brought home to the knowledge of the prisoner.

4. In overruling the motion of prisoner's counsel to strike out the testimony of J. Fletcher Budd, it having failed to fulfil the offer under which it was admitted, to wit, to prove an equitable title by parol agreement.

5. In overruling motion of prisoner's counsel to prove all the circumstances connected with the making of Mrs. Goersen's will, the conveyancer's conversation with the deceased and the prisoner in reference thereto, at the time.

6. In permitting the district-attorney to ask, on cross-examination, an irrelevant question of a witness, for prisoner

(Honig), for the purpose of contradicting him afterwards, and thus discrediting his character for veracity.

7. In overruling prisoner's offer to prove that deceased was in the habit of taking arsenic ten years prior to her death.

8. The evidence in the case does not disclose the existence of the necessary ingredients to constitute murder in the first degree.

9. By the separation and misconduct of the jury during the trial, the prisoner was deprived of the rights guaranteed him by the constitution of this Commonwealth and by the constitution of the United States.

The following additional assignment was filed at bar.

10. In refusing the offer of counsel for prisoner to prove that Dr. Goersen, Sr., the father of the prisoner, before his death, told him Mrs. Sonder could not recover, but that the son should continue ;to give her *cina arsenicum* and other medicines.

(The several assignments contained references to the pages of the printed testimony.)

*Edmund Randall*, for the plaintiff in error, presented an elaborate oral and printed argument on all the questions in the case.   With reference to the 9th assignment of error (the separation of the jury and the unauthorized admission of a physician into the jury room) he argued that under the bill of rights, the constitution and the law, the accused is entitled to trial by an *impartial* jury, who must give their verdict under oath, upon the evidence, under all the safeguards established by law, and absolutely apart from foreign influence, or *opportunity* for such influence.   It is of vital importance that no infringement be permitted on this ancient and salutary rule.   It is not a question, in Pennsylvania, whether a juror was actually influenced by improper and illegal means, but whether an illegal opportunity existed for the introduction of such influence: Peiffer *v.* Commonwealth, 3 Harris, 468; Cooley's Const. Lim., 392.   If it be said that the illness of the juror made it necessary to call in the physician, the answer is that the jury must be discharged, or the verdict set aside.

[TRUNKEY, J.   Do you hold that in such case the prisoner could be again tried for his life?]

Yes—where the irregularity was a necessity caused by act of God.

I am aware that the question of the effect of separation of jury during a trial for murder, was raised in the recent case of Alexander *v.* Commonwealth, 9 Out. 1, but it arose there upon an assignment of error to the refusal of the court below to grant a motion in arrest of judgment and for a new trial, and it was

held that that was a matter within the discretion of the court below, and not the subject of review on writ of error. I do not put the error assigned in this case upon that ground, but upon the defendant's constitutional right to an impartial jury acting under all the safeguards which the law has wisely provided in cases where the prisoner's life is at stake.

*George S. Graham*, district-attorney for the Commonwealth, defendant in error.—The juror was suddenly in severe illness, in the night time, liable to die without medical attendance, and. the coroner's physician was called in. There was no separation in fact, the door between the two communicating rooms being open. The evidence established that the physician only examined and consulted with the juror as to his illness, nothing passed between them as to the case; it was a necessity of humanity, and no more separation than when on trial jurors are necessarily permitted to retire temporarily upon the call of nature.

Chief Justice MERCUR delivered the opinion of the court, October 6, 1884.

We have given to this case that careful examination and consideration, which its magnitude demands. The controlling questions which arise were presented when the case was here before, (3 Out., 388).

As we adhere to our rulings then made, and as the evidence is substantially the same in the latter trial, as in the former, we deem it unnecessary to discuss many of the assignments separately or at length.

The alleged errors covered by the first four assignments were properly argued together by the counsel for the prisoner. They relate to the admission of evidence and the effect thereof.

It was said in the former case, a defendant cannot be convicted of the offence charged merely because he has committed another offence either of a similar or dissimilar kind: nor can such evidence be received to impeach his general character nor merely to prove a disposition to commit crime.

We then proceeded to state some of the circumstances under which evidence may be given of the commission of another offence by the defendant. The court followed that ruling. It was justly admissible to prove motive, to show guilty knowledge and purpose and to rebut any inference of mistake and to connect the other offence with the one charged as part of the same object to be attained. There was therefore no error in admitting the evidence; nor was there any in refusing to strike out the testimony of Budd.

[Goersen v. Commonwealth.]

The evidence having been received the question is, was it improperly presented or commented on by the court? The answer is, that it was so well presented that no error is assigned to any portion of the charge; nor is there an allegation of inadequacy. The counsel for the prisoner did not even present the charge for our inspection. The other side however has done so. It contains a full, clear and correct review and presentation of the evidence, as well as of the grounds of defence, and the law applicable to the case.

The fifth assignment is to the rejection of evidence offered. So much of the evidence contained in the offer, as tended to rebut the theory of the commonwealth, as to the question of motive, was admitted. The declaration of the prisoner made afterwards was no part of the *res gestœ*, and was properly excluded when offered in his favor.

The purpose in asking the question of Honig, referred to in the sixth assignment, is not shown by the record. The object was to ascertain if he had not made a statement inconsistent with the general tenor and effect of his evidence. The question therefore on cross-examination was entirely proper. It is true two witnesses called on the part of the Commonwealth were afterwards asked questions for the purpose of contradicting Honig; but no error is assigned to allowing the questions nor to the answers.

The statement in the seventh assignment, of the offer of evidence, does not agree with the offer shown by the record. The record says " the defence offers to prove that on a former occasion some ten years previously the witness had seen the deceased Lizzie Goersen then Lizzie Souder taking arsenic ; that Lizzie Souder told her it was arsenic and also told her that she had to take it for her health." The court said it would admit the offer if it was to be followed by other evidence bringing the habit down to any reasonable period before the death of Mrs. Goersen; but as made, it was too remote. No offer was made to prove any such act or habit within the ten years preceding her death. The evidence offered was clearly inadmissible.

There is no merit in the eighth assignment. The whole character and tendency of the evidence was to prove a wilful deliberate and premeditated killing. All cases of murder thus perpetrated, or by means of poison, with like deliberation and premeditation, the Act of Assembly declares shall be deemed murder of the first degree.

No such separation of the jury was shown as to establish any misconduct or to deprive the prisoner of any right guaranteed to him by the Constitution. Conceding the attendance of the physician on the sick juror without the knowledge and order of the court was wrong; further conceding that a

10 OUTERBRIDGE.—32

presumption thereby arose which the Commonwealth must remove; yet it is clearly proved, without contradiction and beyond all doubt, that nothing was said or done which had the slightest tendency to prejudice the rights of the prisoner.

The case was carefully and well tried. There was evidence of all the ingredients necessary to constitute murder in the first degree. Its truthfulness was for the jury. We see no reason to question the correctness of the verdict nor of the judgment entered thereon.

> The judgment is affirmed; and it is ordered that the record be remitted to said Court of Oyer and Terminer for the purpose of carrying the sentence into execution.