## Thompson *v.* Conemaugh Iron Works et al., Appellant.

Submitted April 10, 1934.

Before Trex-ler, P. J., Keller, Cunningham, Baldrige, Stadtfeld, Parker and James, JJ.

*Peelor and Feit,* for appellant.

*Jack & Jack,* for appellee.

OPINION BY STADTFELD, J., October 26, 1934:

This is a workmen's compensation case in which Catherine Thompson makes claim for the death of her husband, David W. Thompson, who was an employee of the Conemaugh Iron Works, the defendant, in the Borough of Blairsville, Indiana County. The claim was allowed by the referee and the board and judgment entered on the award by the lower court.

The only question for this court is whether or not there is legally competent evidence in the record to sustain the findings of the referee and the board.

The referee has found, inter alia, "that the deceased sustained an abrasion to his right shoulder when being struck by the iron bar while at work in the course of his employment with the Conemaugh Iron Works on September 15, 1931, that the defendant company had knowledge of the accident shortly thereafter, that the decedent was suffering with diabetes and that the injury caused a carbuncle to form, which caused a systemic infection, dying from sepsis, his death being hastened as a result of the accident he sustained."

Decedent was aged 72 years and was employed by

the Conemaugh Iron Works, his duties being operating an air compressor. He worked on night shifts, his hours of work were from 5 o'clock in the evening until 5 o'clock in the morning. George A. Baker, also an employee of the same company, who worked on the opposite shift from that of decedent, in the same character of work, testified that he himself went to work at 4:45 or 20 minutes to 5 in the morning; that one morning in September, 1931, as he went to the compressor room, where he was about to start to work, as soon as he walked in, decedent asked him if he would fill the "idler," as he hurt his shoulder with a bar he used to pull the grease cups up, and he wasn't able to fill them; that it was necessary to fill the grease cups on this idler as part of his duties. "Q. What did he tell you happened when he turned the idler over. A. He walked over with me—I went over to the compressor right away—and, he showed me how he had— he didn't show me, he told me how he got hurt. He got the bar in the spoke and pulled down on the spoke on the bar and went to turn the wheel and the bar slipped off the spoke and came down and hit him on the shoulder. Q. When you went to work did you go immediately to the compressor room? A. Yes, right away I went to the compressor room and he told me just as soon as I walked in. Q. Immediately when you came then he told you about the accident? A. Yes it was 15 or 20 minutes to 5. Q. State whether or not any one else was employed in this room? A. No there was no one else there. ...... Q. Was there any one else employed in that particular place where this deceased worked? A. I don't think so. The watchman goes through every hour, but outside of him there's no one else there. Q. There was no one else there when you came there? A. No. Q. Did you afterwards observe whether Mr. Thompson had any trouble with that shoulder he told you he got

hurt? A. I still asked him about his shoulder. A. He told me that he had a carbuncle on it, and a few mornings after that he raised his shirt up and he had a poultice of some kind on it, and he raised that up, and one look was enough for me ...... it was all red ...... Q. Do you know how long this was after the time he told you he had been injured? A. I don't remember. I didn't pay much attention to it. I couldn't say what time it was. I know that on the night of the 25th of September was the last time he worked. ...... He went home on the morning of the 26th. Cross Ex. ...... Q. He didn't show you his shoulder that morning? A. Not until the morning of the 26th. ...... Q. At that time he said he had a carbuncle? A. Oh, it was several days before that he told me about the carbuncle. ...... Q. You say, now that you were the only one in that department? A. That morning, yes. Q. That morning at that particular time when you arrived there, or about 4:45 A. M.? A. Yes, along there. Q. Did he tell you where this had happened? A. He didn't. Q. Didn't tell you whether it was that morning or the night before? A. No, it stood idle at night, and we never had any particular time of the night. Q. Did he tell you it was that night? A. Yes, he told me it was that night. Q. Are you sure? A. Yes, I am sure. Q. Didn't he tell you it was several days before that? A. No, he told me when I was starting the idler that he hurt his shoulder. Q. But he didn't tell you when he hurt his shoulder? A. No. Q. He worked, then, for a week after that, did he not? A. Yes, and maybe more. ...... Q. Did he tell you which shoulder he hurt that morning? A. Yes. Q. Which shoulder was it? A. The right one.''

Catherine Thompson, claimant, testified that her husband died on October 20, 1931, at the Presbyterian Hospital, Pittsburgh; that Dr. Barach was in attend-

ance at the time of his death. "He told me in the morning when he came home that he had hurt his shoulder when prying and it was hurting him so bad that he didn't think there was much use in going to bed. Q. When was that Mrs. Thompson? A. Well along in September, I think. I didn't keep the dates but I think along about the second week in September as near as I know. Q. During what time of day did Mr. Thompson work? A. He went to work at 5:00 o'clock in the evening and he came home at 5:00 in the morning. ...... What is between your home and the Iron Works? A. Railroad track. ...... Q. How long before the time that Mr. Thompson was to report to work was it necessary for him to leave home? A. Oh, he could get there in five minutes. That was plenty of time. Q. When he came home this morning to which you have testified to, did you hear him coming in? A. Yes, I heard him coming in. Q. State whether or not he came immediately to your room? A. He always came right up. Q. Well did he that morning? A. Yes. ...... Q. State when, with reference to the time he came into your room, he made this statement about suffering an injury while at work. A. Well right away. He said he didn't think there was any use going to bed. He said he didn't think he could sleep. Q. Did he state to you what time he suffered this injury? A. No, he didn't say just what time in the night it happened. Q. Did he show you his shoulder that morning? A. Yes, I got up and bathed his shoulder. Q. When you examined his shoulder state whether or not you saw any mark there? A. Well I didn't have my glasses on, but it seemed to be just a little streak appeared there, but I couldn't say whether that was from the pry. Q. Was there any discoloration, or not? A. No, just that mark. ...... Q. Did you see his shoulder later? A. Yes. He complained from that on every day and night

until he died. He never got better. He got worse all the time. Q. Did you continue to treat his shoulder for him. A. Well, I bathed it, that's all. The carbuncle started to come then and I didn't touch it, and he went to the doctor then. Q. Did he then go to Dr. Riley? A. Yes sir. Q. Do you know how long that was after he was hurt? A. Well, I know on the 17th of September it was very sore and he started then to treating it. ...... Q. How long was it after this day? A. Well, I think it was about the second week in September. Q. No, you don't understand me. Do you know how long that was after this morning when Mr. Thompson came home and told him he had hurt his shoulder that night? A. No, I didn't keep any date of it. Q. Was it a long time or a short time? A. No it wasn't very long. Not such a long time. ...... Q. Now, you say that some time in September your husband came home one morning and complained of his shoulder? A. Yes, sir. Q. What shoulder was that? A. Well it was his right shoulder. Q. Was it the front part of his shoulder or the rear part? A. Right in the center part, like, of his shoulder, as near as I can tell. ...... Q. Had he been complaining of trouble in that shoulder before that? A. Well, he had rheumatism different times, but not at that time he hadn't. ...... Q. This complaint on this particular morning was just in line with the same complaints he made before in that shoulder? A. No, his shoulder was hurting him so bad he could hardly wait until the other man came to let him off. ...... Q. Well, when did he say he had used this bar? A. Sometime that night? Q. That same night? A. Yes, at night ...... Cross Ex. Cont. Q. There were no abrasions, the skin was not broken? A. The skin wasn't broken, but a short time afterwards it showed up terrible. Q. Afterwards it developed into a carbuncle? A. Yes."

On behalf of defendant, B. F. Beatty, machine shop foreman for defendant, testified that he saw decedent in the month of September, 1931, at least three times when decedent said his shoulder was hurting him, and on being asked what was the cause of it he said it was a carbuncle or boil, and that there had been no accident. The witness said to him that he should report it if he had been injured and decedent said he wasn't hurt. These conversations witness stated occurred around the middle of September.

Dr. F. St. Clair Riley, a physician of 27 years practice, testified that he attended decedent in September, 1931, for an infected place on top of his shoulder which afterwards turned into a carbuncle; that he had been a diabetic for a long time; he stated at the time he came that he thought the beginning of this infection was due to a bar which he used to start some kind of a machine, knocking against his shoulder; that he treated him for about a week and then told him to go to the hospital; that in his professional opinion, from the history of the case as given to him by Mr. Thompson, the carbuncle for which he treated him was the result of the injury of which Mr. Thompson informed him. On cross-examination, he stated that he saw no marks of external violence, just a redness there; that these carbuncles do not arise without some external irritation; that he did not diagnose it as a carbuncle first, it was starting of an infection; that he consulted him on the 18th of September, 1931; in his professional opinion the carbuncle contributed to his death.

Dr. Joseph H. Barach, a practising physician of 29 years experience, and who specialized in internal medicine and in diabetes, testified that decedent came under his care in the hospital on October 6, 1931; that the patient's history revealed that he had diabetes beginning April, 1931, and that a carbuncle appeared September 15, 1931, and that he had had an injury to

his right shoulder; that he found a large carbuncle on his right shoulder covering practically the entire shoulder; that Mr. Thompson was under his care until the day of his death, October 23, 1931; that the carbuncle was excised on October 8, 1931 by Dr. Decker at the request of the witness; that a diabetic is more subjected to carbuncles than one that is not a diabetic and that infection occurs much more frequently in diabetic patients than in any other group of patients. He further testified that the site of the carbuncle in this patient was a very unusual location for the ordinary carbuncle which occurs on the back of the neck; that the fact that this patient had a carbuncle on this particular location would in all probability indicate it came from an injury and he accepted it as such, and in his professional opinion the injury suffered by David W. Thompson caused his death; that when the patient entered the hospital he was too ill to complain, he was an elderly man suffering with diabetes and a severe systemic infection; he was in a semi-comatose state; that diabetic patients are not comatose until either they develop diabetic coma or suffering some infection; that the semi-comatose state in which he found him he attributed to the infection; there was no evidence of lacerations, contusions or any hemotoma resulting from an accident; that as the witness had seen carbuncles, they are always at the site of injury; that trauma is the initiating cause of a carbuncle; that the primary cause of death was sepsis, poisoning.

Appellant contends that there is no competent proof of any accident, that such proof as was offered is entirely hearsay and that it consists entirely of declarations which are not a part of the res gestae and therefore inadmissible.

As stated in Smith v. Welsh Bros. et al., 102 Pa. Superior Ct. 54, 57, 59, 156 A. 598: "In deciding what declarations are admissible under this doctrine, no

fixed time or distance from the happening of the litigated act can be established as a standard to determine what shall be part of the res gestae. Each case must stand on its own facts: Com. v. Werntz, 161 Pa. 591; Com. v. Stallone, 281 Pa. 41; Com. v. Gardner, 282 Pa. 458. . . . . . . In this class of cases the rules of evidence are not applied with the same rigor as in litigation before a jury. A strict technical application of these rules would often defeat the chief purpose of the Workmen's Compensation Act which is intended to give compensation to employees injured by accidents in the course of their employment: Johnston v. Payne-Yost Co. supra": (292 Pa. 509).

The probable nature of an accident followed by death for which compensation is claimed may be established by circumstantial evidence alone.—McCauley v. Imperial Woolen Co. et al., 261 Pa. 312, 104 A. 617.

The watchman, who, according to the testimony ex parte defendant, makes hourly rounds during the night, through defendant's works, was not called as a witness. If we accept as true the testimony as to the alleged declarations of the decedent to George A. Baker, as to the accident, at 4:40 or 4:45 o'clock, of the morning just when Baker went to work, and he was the first person to whom any statement was made, as no other person was working in the vicinity where decedent worked, it is a reasonable inference, from the testimony, that the accident happened and the declaration was made sometime between the last hourly visit of the watchman and the time when Baker arrived on the scene. Baker was the first person to whom any statement could have been made after the accident, and the same was made as an explanation of why the decedent was unable to perform the work, accompanied by a request for Baker to do so for him.

We are not required to decide whether or not the declarations to the wife were part of the res gestae, as

the testimony of George A. Baker, and the proper inferences to be drawn therefrom, together with the testimony of Dr. Joseph H. Barach and Dr. F. St. Clair Riley, are, in our opinion, sufficient to sustain the findings of the board on which to base an award.

A similar situation presented itself in the case of Van Eman v. Fidelity and Casualty Co., 201 Pa. 537, where the declarations to the wife, made several hours after the accident, had been received in evidence. The Supreme Court, however, refused to reverse because there was sufficient evidence, independent of these particular declarations, to sustain the judgment.

For a comprehensive discussion on the question of res gestae, see opinion by our Brother PARKER in the case of McMahon v. Edward Budd Mfg. Co., 108 Pa. Superior Ct. 235, 164 A. 850. See, also, Smith v. Stoner, 243 Pa. 57, 89 A. 795. If there is competent evidence to sustain the findings, we accept them as true: Slemba v. Hamilton & Sons, 290 Pa. 267, 268, 138 A. 841.

After a careful consideration of the entire testimony, we concur in the view of the court below, that there is legally competent evidence in the record to support the findings of fact and conclusions of law of the referee which have been sustained by the board.

The assignments of error are overruled and judgment affirmed.