Smith *v.* State Workmen's Insurance Fund et al., Appellants.

Argued April 18, 1940.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, RHODES and HIRT, JJ.

*S. H. Torchia,* with him *Ralph H. Behney* and *Claude T. Reno,* Attorney General, for appellants.

*Russell R. Yost,* of *Graham, Yost & Meyers,* for appellee.

Opinion by Hirt, J., July 19, 1940:

The question raised in this compensation case is whether there is evidence sufficient to support the finding of the referee and the board that the cerebral hemorrhage which caused the death of the employee was induced by an electric shock. It will be helpful to review the testimony somewhat in detail.

Claimant's husband, who had worked for defendant continuously for six years, was employed as a "pumper". The pumps were electrically driven and were distributed throughout the mine. His duty was to see that they were lubricated and to keep them operating so long as there was water to be pumped and to stop them when dry. He worked alone and traveled considerable distances from one pump to another within the mine on a motor car. In apparent good health he went to work in the evening of June 14, 1935. He was found about 6:30 the following morning, by another pumper who had just come on duty, lying face downward between the tracks at the intersection of the Main Heading with the 11th Right Heading. There is evidence that he had served all of the thirty pumps on his round except the one in the latter heading and that he had thrown a mechanical track switch on the main line and had diverted his motor into No. 11 heading apparently intending to service the one remaining pump at the foot of that heading. The motor car was found standing partly off the main track with the trolley pole "dogged" down. There is no contention nor evidence that decedent came in contact with the live wires overhead. The workman who found decedent testified: "Q. What condition was he in, conscious or unconscious? A. Conscious. Q. Could he talk to you? A. Well, I asked him what was the matter. I asked him a couple of times, and he said, 'I am sick, I am sick.' " This is the only evidence of anything said by decedent until four days later.

Decedent was removed from the mine at once and was taken to a physician. He was found to be in extreme shock and was then unconscious. The tentative diagnosis was cerebral hemorrhage. At the hospital, to which he was then removed, he regained consciousness four days later and is alleged, immediately, to have made the following statements which were admitted as part of the res gestae over objection. Claimant testified: "Q. What statement did Mr. Smith make to you immediately upon becoming conscious? A. He was talking about switches and switches and switches. I says, 'What do you mean by switches, John?' and he said, 'I pulled a switch and it jerked my arm and then I don't remember what happened.' Those are exactly the words that he said. Q. Did he say what switch he was pulling? A. No. he didn't. He didn't say what switch or what kind of a switch, or anything." Claimant's brother said: "As he came to—he had been muttering up until that time and you couldn't understand anything that he hardly could say—and when he came to, I asked him, 'John, what happened?' He said, 'I was pulling an electric switch and it knocked me and I can't remember anything after that.'" A patient in a nearby bed testified: "I was lying right across from where John Smith laid and what I heard him say was that he had been at the pumps, taking care of the pumps and he touched this switch and it knocked him down. That is the last I recall."

A number of doctors observed decedent in the hospital and thorough examinations were made. An x-ray of the skull disclosed no evidence of injury and there were no marks on the body indicating trauma or of an electric burn. All of the medical testimony agrees upon a final diagnosis of cerebral hemorrhage of the right brain with resulting paralysis. This diagnosis is conceded to be correct. He died on August 7, 1935. There is substantial agreement among the medical wit-

nesses that, assuming a history of electric shock, the hemorrhage most probably was induced by it, (*Jones v. Phila. & Reading C. & I. Co.*, 285 Pa. 317, 132 A. 122), but without that assumption the stroke must be considered spontaneous and of natural origin. No evidence of death from other than natural causes was found upon the body. An autopsy was requested by the physicians and the coroner but was refused by claimant.

From the record it is apparent that claimant's proof of an accident and the right to an award must depend upon the admissibility of the declarations of decedent four days after the alleged accident.

The principles governing the admission of testimony as res gestae are well settled. They perhaps are nowhere more adequately stated than in *Com. v. Werntz*, 161 Pa. 591, 29 A. 272. The difficulty is in their application for "each case must necessarily depend on its own circumstances to determine whether the facts offered are really part of the same continuous transaction." They must be "made under such circumstances as will raise the reasonable presumption that they are the spontaneous utterances of thought created by or springing out of the transaction itself." The time of utterance with reference to the principal fact is not the controlling element. Spontaneity of utterance rather than coincidence in point of time is the test in determining admissibility. *Broad St. Tr. Co. v. Heyl Bros. et al.*, 128 Pa. Superior Ct. 65, 193 A. 398; *Thompson v. Conemaugh Iron Works et al.*, 114 Pa. Superior Ct. 247, 175 A. 45. If so detached from the main fact as to admit of deliberate design, statements must be regarded merely as narrative of past events and, for that reason, inadmissible and not within the exception to the hearsay rule. 3 Wigmore Ev. (2d ed.) §1746. "No fixed time or distance from the main occurrence can be set up as a rule to determine what utterances shall be

admitted. Each case must depend on its own circumstances": *Com. v. Gardner*, 282 Pa. 458, 128 A. 87.

The referee found as a fact that decedent was found in the mine "in an unconscious condition" and on that finding, claimant invokes the following rule: "The time of the occurrence of the principal act is sometimes, by reason of some special circumstance, extended forward so as to make it coincident and connected with subsequent declarations by constructive continuity of time; as for instance, when the party making the declarations, having become unconscious at the very moment of the occurrence of the principal act, the declarations are made by him at the very moment of his regaining consciousness; under such conditions the act and the declarations are said to be simultaneous by relation, the declarations being spontaneous": 24 Am. & Eng. Enc. Law (2d ed. )685, quoting the language of *Britton v. Washington Power Co.*, 110 P. 20 (Wash.), where declarations made on regaining consciousness eight days after the injury were admitted. The principle is restated with some qualification in 22 C. J. 465 §553 and 20 Am. Jur. 568 §672. "A statement made as soon as the declarant has recovered consciousness, or the ability to speak, may fairly be regarded as spontaneous even though a considerable time has elapsed since the principal occurrence": *Com. v. Puntario*, 271 Pa. 501, 115 A. 831; *Eby v. Travelers' Ins. Co.*, 258 Pa. 525, 102 A. 209.

We recognize the above principle, but the factual premise for its application is lacking. Decedent was not unconscious when found in the mine and how soon he lapsed into unconsciousness does not appear. He, at least, was able to reply to a question put to him by the person who first found him and when asked what was the matter, replied, "I am sick." This is the extent of the spontaneous utterance of thought created by his predicament and under the rule, cannot be sup-

plemented by the later statements. What he said on regaining consciousness four days later, is not admissible as res gestae since he was conscious when found and was able to speak. *The State v. Curtis,* 70 Mo. 594. If an electric shock or any accident had caused his collapse it is most probable that he would have said so to the first person he saw after the event.

The other circumstances are consistent with death from natural causes. The electric switch nearest to where decedent was found in the mine was about 60 feet down the right heading. He had not passed it in coming to the place where his motor was found. It was a "knife" switch with an insulated handle and in operating it, one stood on an insulated platform. It was his duty to inspect the pump at the foot of the heading and he undoubtedly had diverted his motor from the main track for that purpose. The switch controlled the motor at the pump and was "in" and the pump had been operating throughout the previous shift and was running after decedent was found in the mine. He would have reason to pull the switch after having inspected the pump, but not before. There are no circumstances which indicate that he had come in contact with this switch and there was no other electric switch in the vicinity which he would have occasion to operate. At most, the admissible testimony supplies proof of disability from a natural cause overtaking a workman in the usual course of his employment. Death from such disability is not compensable. *Gausman v. R. T. Pearson Co.,* 284 Pa. 348, 131 A. 247.

Judgment reversed and here entered for defendant.