## Commonwealth *v.* Gardner, Appellant.

*Criminal law—Murder—Corpus delicti—Evidence—Burden of proof—Confession—Res gestæ.*

1. On the trial of an indictment for murder the burden rests on the Commonwealth to prove beyond a reasonable doubt, the death, the commission of a felonious act, and that the act was committed by defendant, and the jury should be instructed to find these elements beyond a reasonable doubt.

2. The corpus delicti is to be proved like other facts, and it may be shown by circumstantial evidence, such as confessions, with the caution that before a confession is received the corpus delicti ought to be proved independent of the confession.

3. It sometimes happens in proof of corpus delicti that the circumstances attending the act may be consistent with crime, suicide or accident, but corpus delicti is proven where the circumstances are consistent with crime.

4. Res gestæ are those circumstances which are the undesigned incidents of a particular litigated act, and which are admissible when illustrative of such act.

5. Such incidents may be separated from the act by lapse of time, more or less appreciable.

6. The incidents may consist of speeches of any one concerned, whether participant or by-stander, and they may comprise things left undone as well as things done.

7. No fixed time or distance from the main occurrence can be set up as a rule to determine what utterance shall be admitted; each case must depend on its own circumstances.

8. Where the declarations are made after the event so that they may be said to be a mere narrative of what has happened rather than a spontaneous utterance, they are not admissible.

9. Statements in proof of res gestæ should be confined to the spontaneous utterances made in connection with a startling event

by one under stress of nervous excitement and not due to reflection, premeditation or design.

10. The trial judge has a wide discretion in deciding whether evidence in proof of res gestæ is receivable.

11. An exclamation made by a victim of a shooting is admissible as a part of the res gestæ, where it appears that it was made within a few minutes after the shooting, at the scene of the crime, while the declarant was staggering from the blow, and without visible sign, from conduct or otherwise, from which premeditation or design might be inferred.

12. The fact that the spontaneous exclamations show, in addition to the criminal agency, the person who committed the criminal act, presents no valid objection to the admission; but there must be no intentional mingling of facts which may naturally be separable.

*Criminal law — Murder — Evidence — Dying declarations — Charge of court—Province of jury.*

13. Dying declarations, while solemn evidence, are not to be considered as though given under the sanctity of an oath.

14. The weight of dying declarations as evidence is for the jury, and a suggestion from the court that impending death gives them the additional sanctity of an oath, invades the jury's right to determine what weight should be given them.

15. Where it appears in a murder trial that the deceased at the time of the commission of the crime made a spontaneous exclamation that the defendant shot her, and later in the hospital made similar declarations, but it also appears that she made other statements entirely inconsistent with such declarations tending to show that she shot the defendant and herself through jealousy, and it also appears that she did not, while in the hospital, seem conscious of the great responsibility awaiting her if she uttered falsehood, it is reversible error for the court to fail to instruct the jury that they should consider her state of mind and whether it was free from passion and revenge.

16. In such case it was also error for the court to hold that the statements made in the hospital inconsistent with the other declarations, and offered in evidence to contradict her, must be found to be dying declarations before they could be considered.

17. The statements and conduct of the deceased before the shooting should also have been brought to the attention of the jury.

Argued January 12, 1925. Appeal, No. 3, March T., 1925, by defendant, from judgment of O. & T. Armstrong Co., June T., 1924, No. 3, on verdict of guilty of

voluntary manslaughter, in case of Commonwealth v. William T. Gardner. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Reversed.

Indictment for murder. Before GRAFF, P. J.

The opinion of the Supreme Court states the facts.

Verdict of guilty of voluntary manslaughter with recommendation of mercy, and sentence to one year's imprisonment. Defendant appealed.

*Errors assigned* were various rulings and instructions, quoting record.

*E. O. Golden* and *Francis Shunk Brown,* with them *H. A. Heilam,* for appellant.—The court committed reversible error in admitting the declarations, in face of all the facts, as res gestæ: Com. v. Werntz, 161 Pa. 591; Com. v. Brown, 264 Pa. 85.

Dying declarations are not entitled to the weight or sanctity of an oath: Com. v. Keene, 7 Pa. 293.

Proof of the party committing the crime is not admissible until the corpus delicti has been proven beyond a reasonable doubt and never admissible until the corpus delicti has been proven: Com. v. Puglise, 276 Pa. 235; Com. v. Byers, 45 Pa. Superior Ct. 37.

*Clarence O. Morris,* Special Assistant District Attorney, and *Blaine Mast,* District Attorney, for appellee, cited, as to the res gestæ: Com. v. Van Horn, 188 Pa. 143; Elkins, Bly & Co. v. McKean, 79 Pa. 493; P. R. R. v. Lyons, 129 Pa. 113; Shafer v. Lacock, 168 Pa. 497; Smith v. Stoner, 243 Pa. 57.

As to dying declarations: Com. v. Latampa, 226 Pa. 23; Com. v. DeLeo, 242 Pa. 510; Com. v. Roddy, 184 Pa. 274; Com. v. Kline, 66 Pa. Superior Ct. 285; Com. v. Puntario, 271 Pa. 501.

OPINION BY MR. JUSTICE KEPHART, February 9, 1925:

This case presents some rather unusual features, and, to understand the legal problems involved, it will be necessary to detail at length many of the circumstances connected with the crime.

The defendant, a married man, a short time before the date of the shooting, purchased a restaurant, located on the second floor of a building in Kittanning, Pennsylvania. The dining room occupied the entire front, and in the rear was the kitchen and another room used as a parlor or bedroom. Defendant, during these three weeks, had in his employ a waitress, Elsie Huybrecht, eighteen years old. An intimate relation developed, and, on at least two occasions, they, with others, attended night parties until late hours. The last one took place the evening before the tragedy. They left it after midnight, and took a taxi for a short drive in the country. On their return they went to the parlor or bedroom for the remainder of the night. At nine o'clock the following morning, defendant was aroused to admit his chef, who went into the kitchen. Gardner returned to the room, where he was again alone with the girl. Soon thereafter shots were heard coming from this room, first one, then, after a very short interval, two others in rapid succession. The sounds alarmed the chef and a tenant on the first floor; on hearing cries for help, they rushed to the bedroom. The door was locked; on being broken open, they beheld the girl, dressed in an underslip, staggering toward them. She was shot through the body, but entirely conscious.

Defendant, unconscious, shot in the right side of the head, in the region of the temple, was lying flat on a davenport, used as a bed. The right side of his head was buried in a pillow, his right arm extended downward close to the body, the left hanging over the edge of the bed. His body was covered from hips to shoulders. A revolver was found under some clothing about nine inches from his right hand. No powder marks were on

his face, though powder marks were on the slip of the girl, and there were powder burns around the wound made by the bullet where it entered her stomach.

Both were removed to a hospital; the girl, after an operation, died the next morning; the removal of part of defendant's skull brought consciousness and life to him. Because of a remark made by the girl when the two men broke into the room, the defendant was arrested and tried for murder. The defense was that the girl did the shooting.

The case is appealed on allegations of trial errors, and insufficient evidence to convict on any count. When the chef and the first-floor tenant broke into the room it was impossible to determine from physical objects who was responsible for the shooting, though appellant argues that because of defendant's position on the bed it was not possible for him to have done the shooting, for the reason that the wound instantly produced unconsciousness, making it impossible for him to have assumed the position in bed as described. This contention in part overlooks the fact that he might have shot the girl while in bed, afterwards shooting himself, though the absence of powder marks on his face is of deep significance.

The men who responded to the call for help appeared within three minutes after the outcry; without any suggestion from them, while staggering toward them, clearly conscious, she said, "Help me; Mr. Gardner shot me and himself." This statement was admitted as part of the res gestæ; defendant contends this was error, and also that nowhere was the corpus delicti proven. Thus two principal questions are presented.

In all criminal proceedings it is incumbent on the Commonwealth to establish beyond a reasonable doubt three elements: (1) the occurrence of an injury or loss, —in homicide, a person deceased; (2) a criminal agency,—in homicide, for example, that the death was caused by a beating, gunshot or circumstances indicat-

ing a felonious act (these two combined show a crime has been committed by some one) ; (3) that the defendant is the responsible party. Defendant contends that the crime for which he is charged was not committed.

To avoid the injustice of a conviction where no crime exists, the law has adopted a rule of caution which holds that the corpus delicti must be proven before a conviction can stand. This is emphasized where the state's case depends on a confession by defendant. The fact that a crime has been committed by someone must be shown before the confession will be received: Gray v. Com., 101 Pa. 380; Com. v. Puglise, 276 Pa. 235. The person for whose death a prosecution is instituted may be alive, so evidence that he or she is in fact dead is imperative. As death may have resulted from a cause other than a felonious act, there must be evidence that it occurred under circumstances which point to the commission of a crime. In this manner the corpus delicti is shown. In some states the term corpus delicti includes only the first of the above elements, namely, an injury or loss. But in this and most of the states it covers in addition criminal agency causing the injury or loss: 4 Wigmore, Evidence, 2d ed., sec. 2072, pp. 410, 412; Grant v. Com., 71 Pa. 495, 505; Johnson v. Com., 115 Pa. 369, 391; Cox v. Com., 125 Pa. 94, 102; Com. v. Bell, 164 Pa. 517; Com. v. Russogulo, 263 Pa. 93, 108.

As Professor Wigmore points out, corpus delicti, confined to injury or loss, protects against a conviction where no injury or loss has in fact occurred, as, for illustration, in homicide, no death. Its use in also including a felonious agency affords additional protection, in that conviction cannot be had where the loss or injury is the result of an accident or other noncriminal agency.

In requiring proof of the corpus delicti, with both the injury or loss and criminal agency, no unusual burden is cast upon the Commonwealth. Ordinarily it is shown at the outset of a trial, followed by evidence

of defendant's connection with the crime. It sometimes happens the circumstances attending the act may be consistent with crime, suicide or accident. In such cases, the corpus delicti is proven where the circumstances attending the death are consistent with crime, though they may also be consistent with accident (Commonwealth v. Johnson, 162 Pa. 63), or suicide (Zell v. Com., 94 Pa. 258), and it is not necessary to show by affirmative proof that the latter two possibilities do not exist before evidence as to who did the act is admitted: Com. v. Puglise, supra, 238. It is not enough, however, to show a death, but death must be consistent with a criminal act before a conviction will be sustained.

The burden rests on the Commonwealth to prove beyond a reasonable doubt all three of the elements above mentioned, namely, death, the commission of a felonious act, and that the act was committed by the defendant; the jury should be instructed to find these elements beyond a reasonable doubt: Gray v. Com., supra, 386; Com. v. Puglise, supra, 238.

The corpus delicti is to be proved like other facts, and it may be shown by circumstantial evidence (Gray v. Com., supra, 386; Com. v. Johnson, supra, 69; Com. v. Sheffer, 218 Pa. 437; Com. v. Puglise, supra, 238), with the added caution that before a confession is received it ought to be proved independent of the confession.

If the above-mentioned statement, and the dying declaration of the girl (later considered) are to be excluded, or are insufficient to show criminal agency, the Commonwealth is here unable to prove corpus delicti, except the fact that the bullet wound in the stomach may be consistent with crime. The matters that were being detailed by the witnesses were the incidents of this occurrence in the room before and when the shooting took place, up to the moment the girl made the statement later admitted as part of the res gestæ. While the so-called doctrine of res gestæ has no doubt been often misapplied by the courts, and it is sometimes obscure as to

just what is intended by it, and as applied is often unintelligible, these infirmities do not affect the present case. Res gestæ has been variously defined; among the earlier decisions are those of Chief Justice LOWRIE in Hollinshead v. Allen, 17 Pa. 275, 283; Young v. Com., 28 Pa. 501, 504; Miller v. Fichthorn, 31 Pa. 252, 256. An interesting discussion of the subject may be found in 31 Yale Law Journal, 229, in an article by Professor Morgan of the Yale Law School.

· The definition of some authorities, and that adopted here, is, those circumstances which are the undesigned incidents of a particular litigated act, and which are admissible when illustrative of such act. These incidents may be separated from the act by lapse of time, more or less appreciable. They may consist of speeches of anyone concerned, whether participant or bystander. They may comprise things left undone as well as done. Their sole distinguishing feature is that they should be the necessary incidents of the litigated act,—necessary, in this sense, that they are part of the immediate preparations for, or emanations of, such act, and are not produced by the calculating policy of the actors: Com. v. Werntz, 161 Pa. 591, 596.

Stress is laid on acts or words occurring in an unbroken continuity of events, being part of a continuous transaction, so that the thing described or the speech uttered may be freed from the implication of premeditation or design. One of the earlier cases in this State, exemplifying the modern doctrine of res gestæ, is Hanover R. R. v. Coyle, 55 Pa. 396. The admission of spontaneous utterances as part of the res gestæ forms one of the exceptions to the hearsay rule: 3 Wigmore, Evidence, (2d ed.) section 1746, p. 736. The statement is offered for its truth, and it ought to be confined to those utterances, made in connection with a startling event by one laboring under the stress of nervous excitement caused by it, which are spontaneous and not due to reflection, premeditation or design. It ought to be

within the course of continued action. When produced under the excitement of the event, and so soon thereafter that the continuity is not broken, these circumstances preclude the idea of premeditation or design. No fixed time or distance from the main occurrence can be set up as a rule to determine what utterances shall be admitted. Each case must depend on its own circumstances: Com. v. Stallone, 281 Pa. 41, 45; Com. v. Werntz, supra, 596; Com. v. Van Horn, 188 Pa. 143, 167. 'And where the declarations are made after the event so that they could be said to be a mere narrative of what has happened rather than a spontaneous utterance, they are not admissible: Goersen v. Com., 106 Pa. 477, 497; Kane v. Com., 109 Pa. 541, 545; Com. v. Brown, 264 Pa. 85, 91.

Spontaneous exclamations uttered immediately preceding (or following) and connected with the actual infliction of wounds, (Com. v. Morrison, 266 Pa. 223, 228; Com. v. Mulferno, 265 Pa. 247, 249), or deadly assault (Com. v. Silcox, 161 Pa. 484, 497; Com. v. Dennery, 259 Pa. 223, 230; Com. v. Puntario, 271 Pa. 501, 506; and cases above), would be competent proof. This is the character of exclamation which was made here within a few moments after the shooting, at the scene of the crime, while the declarant was staggering from the blow, and without visible sign, from conduct or otherwise, from which premeditation or design might be inferred.

There must be some discretion lodged in the trial court in deciding whether such evidence is receivable as part of the res gestæ. In determining the admissibility of such unsworn utterances, to a great extent a matter of first impression, considering all phases, much latitude should be given to the discretion of the court below. The fundamental thought should be, did the declarant exercise her reflective faculties in her own interest in making the statement? If she did, or if there were grounds for the suspicion of it, the court ought not to

admit the evidence.  The court below did not err in receiving this statement.

As res gestæ includes "all the circumstances which are the undesigned incidents of a particular litigated act," it is obvious it embraces the criminal cause of an injury.  In other words, its proof shows the existence at least of the criminal agency element of corpus delicti. Its probative value makes up the proof necessary to establish this fact in issue.

That the spontaneous exclamations show the person who committed the criminal act, in addition to the criminal agency, presents no valid objection to its admission; the two facts are so interwoven that to compel their separation is not only unnecessary, but also raises technicalities without corresponding benefit to justice. It is not always possible to separate the different items of evidence to show the different elements.  The facts may be so interwoven as to make it impossible to isolate the proof of each separate element.  But there must be no intentional mingling of facts which may naturally be separable, as there need be no artificial separation of naturally interwoven facts.

In Com. v. Puntario, supra, Mr. Justice SADLER outlined the necessary requisites for the admission of dying declarations.  The court below did not err in admitting as such the declaration of the deceased in the hospital, though, under all the evidence, the jury should have been cautioned as to the weight to be given it.  The statement merely coincided with the remark in the bedroom after the shooting.

When the girl was removed to the hospital, she was visited by the chief of police, sheriff, and the district attorney.  The chief of police made inquiry as to what had happened.  She replied, "Jealousy."  Later the Commonwealth proved that, with the knowledge of impending death, she again accused defendant of having shot her and himself.  The court below was exceedingly care-

ful to ascertain the girl's state of mind before admitting the dying declarations.

On the whole it is evident she felt that death was impending, and it is equally true she did not seem to feel that sense of responsibility that usually accompanies one who is about to die. She did not seem conscious of the great responsibility awaiting her in the near future if she uttered falsehood; she did not seem to show that keen appreciation of death and its accompanying circumstances. We make no observation as to why the girl should so act. But the jury, in a case such as exhibited by these facts, should have been instructed to ascertain whether, from her state of mind, she really knew her position, what death meant to her, whether her mind was free from passion or revenge. These are some of the guarantees as to the truthfulness of the statement received in evidence without the formality of an oath. This instruction was not given.

There were other statements made by the girl while she was in the hospital, and statements and conduct immediately before the shooting took place, which would seem to flatly contradict the dying declaration, and to explain her answer to the chief of police when she used the word "jealousy." Several patients in beds close by heard her exclaim during the night, "Why didn't I kill him?" And in reply to a question to her mother asking if the defendant was dead, to which her mother had replied in the negative, Elsie said, "Isn't he? I wish I had killed him." Another patient heard her repeat that statement, and also heard her say to her mother when asked if defendant was in the hospital, "Yes, he is, he is shot twice, He is shot twice in the head." Elsie lived with another girl in a rented room. Between four and five o'clock on Sunday afternoon, the day before the shooting, she came to the room, broke open a savings bank, took from it about thirty dimes, saying to this roommate that she was going to pay her room rent. Her companion remonstrated, telling her the room rent was not due, and in-

quired if she was going to leave. She said, "No, I am going to die." She also told a witness with whom she was acquainted and who was eating in the restaurant the Saturday before the shooting, that she was feeling very blue, and that she didn't care if she lived or died. And we have the further statement, said to have been made, that if she couldn't.have the defendant (whom she knew to be married), nobody else was going to have him. Keeping in view these facts, the Commonwealth relied for conviction solely on deceased's statements, without regard to her counterstatements and conduct in opposition thereto. The court, charging the jury, not only instructed them that if the jury believed these statements were made with the knowledge of impending death they were entitled to the same weight as though given under the sanctity of an oath, but utterly destroyed the usefulness of her counterstatements and conduct. We have not held that dying declarations should be received in evidence as though made under the sanctity of an oath. We said, in Com. v. Railway, 110 Pa. 100, 105, in reviewing the reasons for the admission of dying declarations, that the one most frequently urged left "entirely out of account the influence of the passions of hatred and revenge which almost all human beings naturally feel against their murderers, and it ignores the well known fact that persons guilty of murder, beyond all question, very frequently deny their guilt up to the last moment upon the scaffold." And in Com. v. Mulferno, 265 Pa. 247, 249, "Dying declarations possess an impressiveness which is sometimes out of all proportion to their evidentiary value and the court and jury may sometimes have their better judgment overridden by the admission of such statements; having the effect of sweeping away their impartial attitude, and substituting for it the emotional element, as presented by the picture depicted by the dying man; and, it is on this account, courts have imposed a certain strictness on the admission of these declara-

tions." And it may well be added that there are cases where it would be necessary for the judge to caution the jury in this light concerning a statement that had been admitted as a dying declaration.

Appellee suggests that we tacitly admitted the correctness of the court's instructions in Sullivan v. Com., 93 Pa. 284, 293, where the court below said that a dying declaration is "presumed to impress as strongly with the necessity of a strict adherence to truth as the most solemn obligation of an oath administered in a court of justice. This dying declaration is, therefore, if properly stated, or repeated by the witness on the stand, solemn evidence." In reviewing that statement on an appeal we did not affirm its correctness, but stated that, as it was not objected to, we might well assume that it contained no serious error.

Dying declarations are solemn evidence, but they are subject to the same rules as other evidence, and certainly are not to be considered as though given under the sanctity of an oath. The reason for the admission of such evidence is variously stated, but the weight of this evidence is, and always must be, for the jury, who are to consider it in the manner in which it is brought to their attention, without any added suggestion from the court, such as here appears, which has a tendency to emphasize its truthfulness by adding to the fact of impending death the additional guarantee of an oath. Such a suggestion invades the jury's right to determine what weight should be given the testimony.

But this is not the sole error of the court below. In its charge it practically held that the statement made in the hearing of the other patients must be found to be dying declarations before they could be considered. They were not offered for that purpose. They were offered to contradict the girl's statement that Gardner shot her. And they should have been brought to the attention of the jury in that light when the dying declarations were commented on. They were very important

statements.   These witnesses had absolutely no interest in the result of this controversy, and, as we read this record, they certainly reflected the girl's attitude of mind as well as the labored declarations which were made when death was impending.   When the jury viewed all this evidence in the light as indicated, they could intelligently pass on the truth of the girl's dying declarations.   The conduct and statements of the girl before the shooting took place should also have been brought to their attention.

We emphasize this because the case was exceedingly difficult and represented a very serious situation.   We do not for a moment condone the acts of the defendant, a married man, in the intimate relations he had with this girl.   That was not the charge before the court.   He was indicted for murder, and the court was evidently impressed with the defense, as appears from the sentence imposed after the verdict of voluntary manslaughter, which was coupled with a recommendation for mercy.

We have here dealt with some of the major questions involved without considering others and, in addition, those of minor importance.   We believe that these objections will no doubt be cleared away if the accused is again brought to trial on this indictment.   We here sustain the seventeenth assignment of error.

The judgment is reversed and a venire facias de novo awarded.