Barkman *v.* Erie Indemnity Company, Appellant.

Argued April 10, 1962. Before RHODES, P. J., ER-
VIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and
FLOOD, JJ.

*William Claney Smith,* with him *Lisle A. Zehner,*
and *Smith & Zehner,* for appellant.

*Joseph N. Cascio,* with him *Paul E. C. Fike,* and
*Fike and Cascio,* for appellee.

OPINION BY ERVIN, J., June 13, 1962:

In this action of assumpsit, instituted by Stella K.
Barkman, the widow and administratrix of Harry E.
Barkman, deceased, against Erie Indemnity Company,
defendant, seeking recovery under the innocent victim
coverage clause [1] contained in deceased's liability policy

---

[1] "PART V.   INNOCENT VICTIM INSURANCE   (no charge)
"Payment for Injuries caused by Financially Irresponsible,
Uninsured Motorists or Hit and Run Drivers.
"Coverage G
"If this policy provides coverage for Bodily Injury Liability,
Exchange (1) will pay to the Innocent Victim, or (2) in the event

with the defendant, the jury returned a verdict for plaintiff in the amount of $4,500.00. After refusal of

the Innocent Victim is deceased will pay to the Estate of the decedent or to any surviving kin, any uncollectible valid claim or unsatisfied judgment for damages resulting from bodily injury to or death of an Innocent Victim, subject to the Exclusions, Conditions and other terms of this policy. Such claim or judgment must be for damages resulting from bodily injury to or death of the Innocent Victim caused by accident which arises out of the ownership, maintenance, or use of an automobile, trailer or semi-trailer, (hereinafter called automobile) by a person or persons other than the Subscriber, Spouse, or Minor Children of either, adjudged responsible for damages above referred to.

"Definitions

"The definition of 'Subscriber' under Part I applies to Part V and under Part V:

" 'Innocent Victim' includes and is limited to the Subscriber, Spouse, or Minor Children of either who are residents of the Subscriber's household, (except that if more than one person other than husband or wife are named as Subscribers in this policy, this Innocent Victim Coverage shall apply only to the first two such persons named and not at all to the children of either, unless one so named is the child of the other, and then only to the Spouse and Minor Children of the one who is the parent of the other).

" 'Surviving Kin' means and is limited to spouse, parent, child or dependent.

"Rights of Recovery

"As a condition precedent to recovery under this insurance, the Innocent Victim or someone on his behalf (a) must submit proof of the uncollectibility of his valid claim either because all defendants are judgment proof or because of inability to identify the person or persons responsible; and shall either (b) agree with Exchange on a settlement sum and execute release and affidavit as required by Exchange; or (c) if Exchange so elects, submit the claim under the Commercial Arbitration Rules of the American Arbitration Association, to a Board of Arbitration whose decision shall be binding upon the parties, one member of which to be appointed and paid by Exchange, one by the Innocent Victim within ten days of written notification of appointment by Exchange, and a third to be chosen by the two appointees and paid equally by the parties; or (d) reduce his claim to judgment in a Court of Record and have same returned unsatisfied."

motions for judgment n.o.v. and new trial judgment was entered upon the verdict. The defendant appealed.

The facts are set forth in the opinion of President Judge THOMAS F. LANSBERRY as follows: "On the morning of March 6, 1958, about 10 o'clock, Mr. Barkman, in good health, left his home in Somerset Borough in his Chevrolet sedan automobile for Winchester, Virginia. During that afternoon he was driving westward on U. S. Route 50, a relatively busy, two-lane highway, and reached a point approximately six miles east of Winchester, the point of the accident. The highway was dry and the visibility good.

"Two men, Kenneth E. Parker and James E. Hager, employees of the Chesapeake Potomac Telephone Company, driving eastward on Route 50 arrived at the point of the accident at 3:20 o'clock P.M. There they observed the Chevrolet on the east side of the highway (the opposite side in which it was obviously traveling) the front end against and into the concrete abutment of a small bridge on U. S. Route 50 and the rear portion of the car extending at an angle into the east bound cartway; the motor block and engine of the Chevrolet had been forced back toward the front seat of the car. No other automobile was present upon their arrival. Near and just west of the point of the accident a side road entered onto U. S. Route 50 from the north, that intersecting road being from the right in the direction in which Mr. Barkman's car was traveling.

"Mr. Parker, having been trained in first aid as required by his employer, got out of his car and with his first aid kit proceeded immediately to the Barkman car; by that time several other men had arrived on the scene; Mr. Parker first noticed steam arising from the radiator and some water dropping onto the highway; he next noticed a man apparently very badly injured sitting on the right side of the automobile with the door open. Mr. Parker estimated the accident had occurred within five minutes of his arrival.

"Asked to describe Mr. Barkman as he first saw him, Mr. Parker said the most noticeable thing was the deep laceration over his left eye across the bridge of his nose, bleeding profusely, to which he administered compresses and bound the head, being assisted by two other telephone company employees. About that time blood dripping from beneath the right trouser leg was noticed and upon examination a long cut from inside the leg below the knee across the shin bone from which blood was being emitted was observed and protruding from the leg and the leg almost severed from the right extremity. In this connection Mr. Parker stated: 'Of course, when we first got there, the reason we knew we were there within a few minutes, we saw no blood on the ground, it evidently hadn't dripped so much and fell upon his shoes, etc. to the extent it would get on the ground.'

"Mr. Parker was then asked, 'Did Mr. Barkman make any statement to you as to what had happened? A. He mentioned when we first came up there that he tried to avoid a collision with a gray car that had cut in front of him, I didn't pay much attention to the remarks, we were pretty busy trying to bandage him up. He turned while I was working on his head, I remember I told him to hold still, he was looking back over his shoulder and wanted to know if the gray car had stopped. Q. Did he indicate to you at the time you were treating him there at the scene what happened? A. He said that this gray car,—there was a side road on the right as Mr. Barkman was proceeding west, a dirt road there, he indicated that the car coming in the opposite direction which would have been east the same direction we were coming in, had cut in front, that the car had cut in front of him to go up the side road and that he had tried to avoid a collision with the car.'

". . .

"This witness concluded the substance of his testimony by referring to the skid marks on the highway

stating the skid marks were in a straight line in the westbound lane, they veered slightly to the right and then veered to the left to the wheels of the Barkman car.

"The other witness called by the plaintiff, James E. Hager, testified as to and in corroboration of the testimony of Mr. Parker, adding to that testimony that upon their arrival at the disabled car, Mr. Barkman was sitting in the front seat of his car, on the right side with both feet out on the ground, that the Barkman car was damaged pretty severely and that Mr. Barkman said that 'a car coming toward him cut across in front of him, he had to swerve to miss him.' "

The attorney for appellant argues that the evidence is insufficient to sustain the verdict. He relies heavily upon the case of *Ebersole v. Beistline*, 368 Pa. 12, 82 A. 2d 11. In that case there were no eyewitnesses of the accident. In the present case there was an eyewitness, to wit: Harry E. Barkman. The eyewitness account given by Barkman through the testimony of Kenneth E. Parker and James E. Hager, coupled with the physical facts as testified to by these two witnesses, who arrived on the scene shortly after the happening of the accident, sufficiently pictures enough facts to show what really happened.

Barkman was proceeding west on U. S. Route 50 in his Chevrolet automobile at about 3:20 p.m. on March 6, 1958, at which time the weather was clear and the highway dry. A gray car driven by an unknown driver was proceeding in an eastwardly direction at the same time and place. The unknown driver suddenly turned this car to the left and immediately in front of Barkman's car. Barkman made a sudden turn to the left and applied his brakes to avoid an accident, thereby causing his car to skid into an abutment on his left-hand side of the road. The impact pushed the motor and its block back into his car, thereby causing the in-

juries which resulted in his death approximately nine hours later.

It is argued that the testimony does not reveal whether the unknown driver gave any signal prior to making the left-hand turn and that the evidence does not reveal how far his car was from the Barkman car when the left-hand turn was made. While this is true we must assume that Barkman exercised due care for his safety and therefore we may assume that he did not contribute any negligence to cause the accident. It is our opinion that there was sufficient evidence presented to enable the jury to determine that this accident was caused by the negligence of the driver of the gray car.

Attorney for the appellant also argues that it was error to admit the testimony of Kenneth E. Parker and James E. Hager concerning the statement made by Barkman as an exception to the hearsay rule under the provisions of res gestae. The two witnesses testified that they came upon the scene approximately within five minutes after the occurrence of the accident. They fixed this time because they were the first to arrive at the scene, notwithstanding the highway was a busy one at that point; because the motor was steaming and water dripping out of the radiator; and because when they first arrived the ground was dry and within a few minutes thereafter a pool of blood began to collect thereon from the leg wounds received by Barkman. Spontaneous exclamations or declarations uttered during or immediately preceding or following the actual infliction of wounds are admissible within the res gestae rule: *Com. v. Rumage*, 359 Pa. 483, 486, 59 A. 2d 65; *Com. v. Gardner*, 282 Pa. 458, 128 A. 87.

Res gestae declarations "ought to be confined to those utterances, made in connection with a startling event by one laboring under the stress of nervous excitement caused by it. . . .": *Com. v. Gardner*, supra; *Com. v. Noble*, 371 Pa. 138, 145, 88 A. 2d 760.

"Any exclamation, which is uttered before the dust and smoke of the mishap which gave it birth subsides, and while the agony and the hurt of the misfortune is yet unspent, is admissible in evidence as part of the res gestae." *Campbell v. Gladden,* 383 Pa. 144, 148, 118 A. 2d 133. See also *Com. v. Harris,* 351 Pa. 325, 336, 41 A. 2d 688; *Hansky v. J. & L. Steel Co.,* 149 Pa. Superior Ct. 605, 27 A. 2d 789; and an extensive annotation in 53 A.L.R. 2d 1245.

We are satisfied that the trial judge did not err in admitting Barkman's declarations.

"Considerable latitude is allowed the trial judge in admitting or excluding such evidence, the fundamental question being whether the declarations were spontaneous utterances induced by or arising out of the transaction, or whether there is reasonable ground for believing that declarant, in making the statements, was exercising his reflective faculties in his own interest." Henry, Pa. Evidence, 4th ed., §466.

We quote in this connection what was so well said by President Judge LANSBERRY: "Let us as best we can attempt to reconstruct those few minutes in Mr. Barkman's life. Admittedly the event itself was sudden; to his body and to his mind the impact produced a jolt, a severe jolt; any other conclusion would be strained and contrary to human experience except it be in the case of a most extraordinary human being. That severe jolt resulted in pain and some shock; all human experience compels this conclusion. The period of shock may not have been lengthy and the magnitude of the pain may have been relative. In that physical and mental state, to whom did he make these declarations? Indeed, to the very first persons who arrived upon the scene of his plight. Did they attempt to elicit from him how the event occurred; the evidence is otherwise; they first addressed themselves to their most immediate purpose, the attempt to save his life and prevent him from

bleeding to death. In that setting is it not more probable that the statements were volunteered by this helpless victim and were not made as a result of mental processes answering an interrogation (which of course does not negate them as res gestae under proper circumstances). And what about the turn of the head over his shoulder to see where the gray car was; in his immediate physical and mental condition, is it reasonable to suppose that he conjured up that physical attempt as part of a reflective process, or is it more reasonable to attribute that gesture as an involuntary, human reflex action? At this point let us again recall what Mr. Barkman said and did immediately after the arrival of the two witnesses; in substance he said that a gray car cut across in front of him and he tried to avoid it, and simultaneously with those words looked over his shoulder in an attempt to locate that gray car. Now if as suggested by the contention advanced, these words and this gesture were the responsible results of the reflective faculties, would not Mr. Barkman have been more likely to have made utterances or declarations giving some details as to the speed of that car, the distance it traveled before swerving in front of him, whether or not the operator of that car had given a turn signal and something more descriptive of that car other than that it was gray? If Mr. Barkman's mind and mental processes were such that he consciously designed to blame the operator of the gray car he could quite easily and very naturally have done better in this regard. The fact that these ordinary, usual, simple and almost universal descriptive minimum details of an accident are here absent lends credence to the conclusion that the bare and minimal statements uttered by Mr. Barkman are part of the res gestae rather than the results of reflective faculties or processes on his part under the circumstances described."

In addition it should be recalled that Barkman at the time of making the statements was suffering from a severe cut over the eye and one leg had been nearly severed. He was literally bleeding to death. We do not believe that a man in this condition would be conjuring up a story to place the blame upon the driver of the gray car.

The attorney for the appellant also argues that it was error for the court below to admit the death certificate issued by the Department of Health, Bureau of Vital Statistics, of the Commonwealth of Virginia, over his objection since the provisions of the Act of Congress, 28 U.S.C.A. 1739, were not complied with. Such a certificate, if issued by the Department of Health of the Commonwealth of Pennsylvania, would be admissible as prima facie evidence of its contents. See the Act of June 29, 1953, P. L. 304, art. VIII, §810, 35 PS §450.810.

The evidence without the certificate clearly establishes the death as the result of the physical injuries sustained in the accident. Barkman was in good health when he left his home at ten o'clock that morning. He was found in serious condition immediately after the happening of the accident at about 3 :20 p.m. that same afternoon. His leg was nearly severed, he had a deep laceration over his left eye and across the small bridge of his nose down into the lower eye cavity underneath the eyeball and he was bleeding profusely. He was immediately taken to the hospital where he died about 1 :00 a.m. the following morning. This evidence is sufficient to show that the death was caused by the accident, without relying upon the certificate of death. The admission of the death certificate was at most harmless error.

Judgment affirmed.