# Ritter v. Garlock Inc.

*Lee B. Balefsky,* for plaintiffs.
*David A. Damico,* for defendant Garlock Inc.
*Edward T. Finch,* for defendant General Electric.
*Robert P. Coleman,* for defendant Viad Inc.

TERESHKO, *J.,* April 15, 2010—Plaintiffs Gerard A. Ritter and Susan R. Norek co-executors of the estate of Gerard H. Ritter, and Alice K. Ritter, in her own right (collectively plaintiffs), appeal this court's orders precluding the use of Mr. Ritter's deposition testimony and granting summary judgment in favor of defendants Garlock Inc., General Electric Co., and Viad Inc. (collectively defendants) and dismissing all claims against defendants.

## I. BACKGROUND

Mr. Gerard H. Ritter worked for the Delaware Lackawanna and Western Railroad, the Erie Lackawanna

Railroad, and the Consolidated Rail Corporation from 1941 until 1981 at various locations in northeast Pennsylvania, northern New Jersey, and upstate New York. (Complaint, ¶¶4-5.)[1] While working on the railroads, Mr. Ritter recalled being exposed to asbestos block, asbestos brake linings, asbestos cement, asbestos cloth, asbestos gaskets, asbestos packing, asbestos steam generator pads, and asbestos pipe covering. (See plaintiff's answer to interrogatories, exhibit A.)

Mr. Ritter was diagnosed with mesothelioma on or about March 8, 2005.

Plaintiffs commenced this asbestos mass tort action on June 21, 2005, alleging that Mr. Ritter's mesothelioma was as a result of his occupational exposure to asbestos products while working for the railroads. Plaintiffs named several defendants, including General Motors, Consolidated Rail Corporation, Erie-Lackawanna Incorporation, Westinghouse Airbrake, The Manville Fund, Garlock, GE, and later Viad.

On May 12, 2006, the parties arranged for Mr. Ritter's videotaped deposition to be taken. The parties agreed that plaintiffs' attorneys would conduct a videotaped direct examination, which would be followed by a discovery deposition by each of defendant's counsel, and then a videotaped cross-examination of Mr. Ritter. (Videotape deposition of Gerard H. Ritter, p. 6.) Defendants Garlock and GE attended the deposition with the intention of fully participating. Defendant Viad, however, was not added until June 12, 2006, one month later. (Docket,

---

1. Mr. Ritter worked for a non-railroad, non-asbestos employer from 1967-1970.

*Ritter v. Viad Corp.,* June term 2006, no. 0906.) At the May 12 deposition, plaintiffs' attorneys conducted their direct examination of Mr. Ritter. At that time, attorneys for other defendants then completed their discovery depositions. None of the moving defendants completed their discovery depositions or began their trial depositions. Attorneys for defendant GE began to depose Mr. Ritter, but were stopped by plaintiffs' attorneys, who terminated the deposition due to Mr. Ritter's fatigue. (Videotape deposition of Gerard H. Ritter, pp. 80-81.) The parties agreed to reschedule the deposition and continue as planned. *(Id.)* Unfortunately, Mr. Ritter passed away two months later on July 20, 2006, before he could be deposed further. As a result, none of the moving defendants had an opportunity to conduct either a full discovery deposition or cross-examination of Mr. Ritter.

On April 7, 2007, defendant Garlock filed a motion in limine seeking to preclude plaintiffs from utilizing Mr. Ritter's video and discovery depositions at trial. In its motion, Garlock argued that because it had no opportunity to cross-examine Mr. Ritter, use of the videotaped deposition would be highly prejudicial. (Garlock's motion in limine, ¶¶11-12.) Anticipating a counterargument from plaintiffs, Garlock also maintained that the deposition was not admissible as a dying declaration because Mr. Ritter remained alive for more than two months after the deposition was halted due to his fatigue. *(Id., ¶¶15-17.)*

In response, plaintiffs argued that exclusion of Ritter's testimony would unfairly prejudice the plaintiffs and that, alternatively, the deposition was admissible as a dying declaration. (Plaintiffs' response to defendant

Garlock's motion in limine, pp. 4-6.) Further, plaintiffs argued that because Garlock had consented to the deposition schedule, and failed to object during the direct examination, it had effectively waived its rights to object to the deposition's later use at trial. (*Id.,* p. 5.)

On August 28, 2007, Garlock filed a sur-reply and plaintiffs filed a response to the sur-reply. On September 1, defendant GE filed a separate motion to exclude Mr. Ritter's deposition testimony. Defendant GE incorporated Garlock's arguments, and argued further that the deposition must be precluded because of the defendants' lack of an opportunity to cross-examine Mr. Ritter. (Defendant GE's motion in limine, p. 2.) On September 26, 2007, this court granted both Garlock and GE's motions in limine and precluded plaintiffs from using Mr. Ritter's videotape testimony and discovery depositions at trial.

On October 14, 2008, Garlock, GE, and Viad each filed separate motions for summary judgment. Viad supplemented its motion on October 28, 2008. Plaintiffs filed responses on November 7, 2008, which were followed by replies from GE and Garlock on November 12, and from Viad on November 17, 2008.

On December 4, 2008, after consideration of defendants' motions, plaintiffs' responses, and defendants' replies, this court granted Garlock, GE and Viad's motions and dismissed plaintiffs' claims.

Claims as to defendants Consolidated Rail Corporation and Westinghouse Airbrake were also dismissed on December 4, 2008. Plaintiffs have not appealed the dismissal of Consolidated Rail Corporation or Westinghouse Airbake. Claims as to the remaining defendants were settled or referred to arbitration on December 4, 2008.

266

On December 19, 2008, plaintiffs timely filed this appeal. On February 16, 2009, in response to this court's order, plaintiffs filed a concise statement of errors pursuant to Pa.R.A.P. 1925(b) raising the following issues:

"(1) Whether this court properly held that Mr. Ritter's videotape and deposition testimony constituted inadmissible hearsay and did not fall under an exception to the hearsay rule as either a dying declaration or as prior testimony; and

"(2) Whether this court committed an error of law and/or abused its discretion in granting defendants' motions for summary judgment where plaintiffs' evidence failed to establish that Gerard H. Ritter was regularly and frequently exposed to asbestos from products manufactured and/or supplied by defendants."

## II. LEGAL DISCUSSION

Plaintiffs' claims center around two separate issues, which will be discussed below. First, as to all moving defendants, plaintiffs claim that Mr. Ritter's deposition testimony was improperly precluded. Second, as to defendants Garlock, GE and Viad individually, plaintiffs claim that there is sufficient evidence to overcome the standards, set forth in the prevailing case law, for product identification and regularity and frequency of exposure to asbestos.

### A. *Preclusion of Mr. Ritter's Deposition Testimony*

Plaintiffs claim that this court erred in precluding Mr. Ritter's videotape and deposition testimony as hearsay. "The hearsay rule provides that evidence of a declarant's

out-of-court statements is generally inadmissible because such evidence lacks guarantees of trustworthiness fundamental to the Anglo-American system of jurisprudence." *Commonwealth v. Vining,* 744 A.2d 310, 317 (Pa. Super. 1999) (quoting *Commonwealth v. Chamberlain,* 557 Pa. 34, 39, 731 A.2d 593, 595 (1999). "Exceptions to the hearsay rule are premised on circumstances surrounding the utterance which enhance the reliability of the contents of the utterance, and render unnecessary the normal judicial assurances of cross-examination and oath." *Id.* Plaintiffs advance three separate theories which they believe make Mr. Ritter's testimony admissible.

## 1. Prior Testimony

Plaintiffs first argue that Mr. Ritter's testimony is admissible as prior testimony. Pennsylvania Rule of Civil Procedure 4020 provides that, when the declarant is dead, prior testimony, such as Mr. Ritter's deposition, may be used at trial "so far as admissible under the rules of evidence." Pa.R.C.P. 4020. Pennsylvania Rule of Evidence 804(b)(1) provides an exception for former testimony:

"(b) Hearsay exceptions. The following statements, as hereinafter defined, are not excluded by the hearsay rule if the declarant is unavailable as a witness:

"(1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had

an adequate opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Pa. R.E. 804(b)(1).

Although "[t]he principle requiring a testing of testimonial statements by cross-examination has always been understood as requiring, not necessarily an actual cross-examination but merely an opportunity to exercise the right to cross-examine if desired," some opportunity to cross-examine must be afforded the party against whom the evidence is being offered. *Garner v. PUC,* 177 Pa. Super. 439, 446, 110 A.2d 907, 911 (1955); but see also, *Beaumont v. ETL Services Inc.,* 761 A.2d 166, 173 (Pa. Super. 2000) (testimony nevertheless admissible when co-defendant's cross-examination amounted to "constructive representation" and assured that defendant's interests were protected even when defendant did not actually cross-examine deponent).

In this case, none of the moving defendants had an opportunity to cross-examine Mr. Ritter. Although the parties had agreed that each defendant would be allowed to take both a discovery deposition and conduct a cross-examination, only defendant GE was able to ask any questions of Mr. Ritter, and even then was only able to begin its *discovery deposition* before plaintiffs' counsel halted the deposition due to Ritter's fatigue. As a result, none of the defendants were able to cross-examine Mr. Ritter despite their obvious intent and desire to do so. Further, due to the unique product identification issues that arise in asbestos litigation, no other defendant could have properly safeguarded the rights of these defendants. Because the moving defendants lacked the opportunity to cross-examine Mr. Ritter, Pennsylvania Rule of Evi-

dence 804(b)(1) precludes the admission of the videotape or deposition testimony as prior testimony.

## 2. Dying Declaration

Plaintiffs next assert that Mr. Ritter's videotape and deposition testimony should be admissible as a dying declaration. (Plaintiff's response to Garlock's motion in limine, p. 6.) Pa.R.E. 804(b)(4) defines a dying declaration as "[a] statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death." Pa.R.E. 804(b)(2). "The reliability of a dying declaration is provided not by an oath, nor [sic] by cross-examination; rather, its admissibility is based on the premise that no one 'who is immediately going into the presence of his Maker will do so with a lie upon his lips.'" *Commonwealth v. Smith,* 454 Pa. 515, 517-18, 314 A.2d 224, 225 (1973) (quoting Lush, L.J., *Regina v. Osman,* 15 Cox C.C. 1, 3 (Eng. 1881)).

To be admissible as a dying declaration, a statement must be made under the belief of impending death. See *Smith, supra,* 454 Pa. at 518, 314 A.2d at 225 ("the evidence must, inter alia, justify the conclusion that at the time the statements were made, the declarant believed he was in fact dying, and also that death was imminent. In other words the admissibility of such evidence depends primarily upon the state of the declarant's mind."). Circumstances can provide indicia of the state of the declarant's mind. For example, in *Commonwealth v. Cooley,* 465 Pa. 35, 43, the fact that the declarant was bleeding from a recently-inflicted bullet wound provided circumstantial evidence that the declarant was

aware that he was about to die. 465 Pa. 35, 43, 348 A.2d 103, 107 (1975); see also, *Barkman v. Erie Indemnity Co.,* 198 Pa. Super. 379, 181 A.2d 874 (1962) (noting closeness in time requirement of so-called "res gestae" hearsay exceptions); *Sadowski v. Eazor Express Inc.,* 213 Pa. Super. 471, 474, 249 A.2d 842, 843-44 (1968) (accident victim's statement was trustworthy and not meant to be self-serving when it was made as he lay crushed in cab of pickup truck); *Rich Hill Coal Co. v. Bashore,* 334 Pa. 449, 483, 7 A.2d 302, 318 (1939) (statements "not made under the solemnity of the consciousness of impending death" inadmissible as dying declarations); *Commonwealth v. Douglas,* 461 Pa. 749, 337 A.2d 860 (1975) (finding death imminent where victim had knife in his back and died within the hour). State of mind may also be inferred from the nature of the declarant's words. *Commonwealth v. Gause,* 459, Pa. 595, 598, 330 A.2d 856, 858 (1975) (dying declaration where declarant specifically indicated in the statement that he believed he was dying).

The question of whether Mr. Ritter's videotape and deposition are admissible as dying declarations, therefore, turns on whether Mr. Ritter's death was imminent at the time he made the statements. It is clear that it was not, and that Mr. Ritter did not believe it to be so. Mr. Ritter did not die until more than two months after the aborted deposition. Further, Mr. Ritter's subjective understanding of his condition seems to be that he was not in imminent danger of death at the time he gave the deposition. During the deposition, plaintiffs' counsel asked Mr. Ritter about his hobbies which included woodcarving. He replied:

"Q: What are your plans now?

"A: Hmm?

"Q: What are your plans for the future?

"A: You know what I'd like to make, you know that Budweiser beer wagon that comes out with all them horses on the top and all the beer kegs on and the guy sitting on, I would like to make that. But, it will be—once I can get the lung back in shape and keep sawdust away from it, I'm going to do that." Video deposition of Gerard H. Ritter, p. 90.

Mr. Ritter's testimony indicates that he was not conscious of imminent death at the time he gave the deposition. His testimony shows a man determined to survive, not one who was resigned to death in the immediate future. Furthermore, plaintiffs' counsel suggested that the deposition would be rescheduled to "next week". As a result, both Ritter's own testimony, and plaintiffs' counsel's conduct dehors plaintiffs' claim that the deposition was made under belief of imminent death, and as such is not admissible under the dying declaration hearsay exception.

### 3. Undue Prejudice

Plaintiffs argue that preclusion of Mr. Ritter's videotape and deposition testimony will result in unfair prejudice. In support of their assertion, plaintiffs suggest that this court should adopt the reasoning of *Derewecki v. Penn. R.R.,* 353 F.2d 436 (3d Cir. 1965). In *Derewecki,* the Third Circuit allowed the plaintiff to introduce deposition testimony of the victim where the victim's first deposition had been halted after the victim had a heart attack, was subsequently rescheduled, and, after provid-

ing a fuller explanation of the events in the subsequent deposition, again suffered a heart attack and died. *Id.* at 438-39. After examining the facts already developed during the victim's deposition, the court reached the conclusion that although the defendant might have preferred more extensive deposition testimony to develop the precise location of the accident, the facts had already been copiously developed, and "[the defendant] 'offers nothing persuasive as to the content or the substance of the further examination of which it may have been deprived.'" *Id.* (citation omitted)

Factually, *Derewecki* is entirely distinguishable from our case in the most critical and sensitive part of any asbestos case, that is, product identification. In *Derewecki,* the Third Circuit placed great emphasis on the fact that the defendant railroad stood to gain no additional information of value from cross-examination of the victim. Here, the ability to identify through cross-examination the facts which would either support or defeat plaintiff's product identification is the heart of the case and that was denied to defendants by plaintiffs' decision to abruptly terminate the examination of Mr. Ritter. The defendants in this case clearly desired to develop the testimony of Mr. Ritter on cross-examination in the hopes of exculpating their clients under the prevailing factors that Pennsylvania courts look to in determining whether a plaintiff has proven a valid asbestos claim. These defendants were unable to do so, making this case distinguishable from the Third Circuit's reasoning in *Derewecki.*

Plaintiffs' interpretation of *Derewecki* as creating a suggestion of a lower standard where the only evidence a

plaintiff can muster is deposition testimony that has not been subject to cross-examination is not accurate. *Derewecki* was decided under the Federal Rules of Evidence; this case is being conducted under the Pennsylvania Rules of Evidence. The Pennsylvania Rules of Evidence do not contain the residual exception of the Federal Rules. *Compare* Pa.R.E. 804 *with* Fed.R.E. 804-807. Also, the prejudice to the plaintiffs in being unable to prosecute their case against these defendants is clearly outweighed by the prejudice to the defendants of having to defend a fact-sensitive case where the victim's testimony of the foundational events was not subjected to their discovery inquiries, let alone cross-examination.

In light of the foregoing, Pennsylvania law requires the preclusion of Mr. Ritter's videotape and deposition testimony, and the order precluding the same should be affirmed.

## B. *Summary Judgment*

Assuming, for the purposes of this discussion, that the unexamined testimony of Mr. Ritter could be considered, it would not satisfy the proof requirements for surviving defendants' motion for summary judgment under the prevailing standards for proximity, regularity, and frequency of exposure to asbestos. See *Eckenrod v. GAF Corp.,* 375, Pa. Super. 187,190, 544 A.2d 50, 52 (1988). "In determining whether to grant a motion for summary judgment, the trial court must view the record in the light most favorable to the non-moving party and resolve any doubts as to the existence of a genuine issue of material fact against the moving party." *Gilbert v. Monsey Products Co.,* 861 A.2d 275, 276 (Pa. Super. 2004). In review-

ing a grant of summary judgment, an appellate court's scope of review is plenary and will reverse only upon finding that the trial court abused its discretion or erred as a matter of law. *Harahan v. AC & S Inc.,* 816 A.2d 296, 297-98 (Pa. Super. 2003). Our Superior Court has determined that:

"there is an inherent three-step process involved in determining whether . . . to preclude a grant of summary judgment. Initially, it must be determined whether the plaintiff has alleged facts sufficient to establish a prima facie case. If so, the second step is to determine whether there is any discrepancy as to any facts material to the case. Finally, it must be determined whether, in granting summary judgment, the trial court has usurped improperly the role of the jury by resolving any material issues of fact." *Dudley v. USX Corp.,* 414 Pa. Super. 160, 168-69, 606 A.2d 916, 920 (1992).

To set forth a prima facie asbestos case, "plaintiff must present evidence to show that he inhaled asbestos fibers shed by the specific manufacturer's product." *Eckenrod,* 375 Pa. Super. at 191, 544 A.2d at 52. The mere presence of an asbestos product in the workplace is not enough; plaintiff must show that he inhaled asbestos fibers from defendant's specific product. *Id.* at 191, 544 A.2d at 53. Additionally, plaintiff's "evidence . . . must demonstrate that the plaintiff worked, on a regular basis, in physical proximity with the product, and that his contact with it was of such a nature as to raise a reasonable inference that he inhaled asbestos fibers that emanated from it." *Andaloro v. Armstrong World Industries,* 799 A.2d 71, 86 (Pa. Super. 2002); see also, *Donoughe v. Lincoln Electric Co.,* 936 A.2d 52 (Pa. Super. 2007).

In addition, our Supreme Court has determined that:

"[I]t is appropriate for courts, at the summary judgment stage, to make a reasoned assessment concerning whether, in light of the evidence concerning frequency, regularity, and proximity of a plaintiff's/decedent's asserted exposure, a jury would be entitled to make the necessary inference of a sufficient causal connection between the defendant's product and the asserted injury." *Gregg v. V-J Auto Parts Company,* 596 Pa. 274, 292, 943 A.2d 216, 227 (2007).

Mere speculation that plaintiff inhaled asbestos from defendant's product is insufficient, as "*Eckenrod* makes clear that [the court] cannot enter such a guessing game." *Samarin v. GAF Corp.,* 391 Pa. Super. 340, 359-60, 571 A.2d 398, 408 (1989). "Summary judgment is proper when the plaintiff has failed to establish that the defendants' [asbestos] products were the cause of plaintiff's injury." *Eckenrod,* 375 Pa. Super. at 191, 544 A.2d at 52. Under these standards, summary judgment is appropriate as to each moving defendant.

### *Garlock*

Defendant Garlock moves for summary judgment on the grounds that plaintiffs failed to produce sufficient evidence that would allow this court to assess whether plaintiffs had carried their burden of proving a prima facie case. Although Garlock strongly maintains that Mr. Ritter's deposition is inadmissible, as discussed *supra,* it argues that summary judgment would nevertheless be appropriate even if the deposition were admissible.

Mr. Ritter mentioned Garlock numerous times throughout his deposition. (See plaintiff's response to Garlock's

motion for summary judgment, pp. 8-9.) Ritter first mentioned Garlock in conjunction with steam locomotives:

"Q: Any other asbestos exposure that you would have had in the roundhouse? . . .

"A: Well, only asbestos compound of brake shoes. I don't recall any other—well, the Garlock packing tool around the pistons and the—they had a regular packing box all around the pistons." (Videotape deposition of Gerard H. Ritter, p. 31.)

Later, he described his use of Garlock packing:

"Q: Now, you mentioned something called—you called Garlock packing?

"A: Garlock packing. Yeah.

"Q: What was that?

"A: It was a rope-type of packing, came on a spool and you would wrap that around the piston. And then there was a sleeve that went up against that with two bolts—two nuts on, you'd tighten that tight on the piston, so—yeah, that was Garlock packing. It was used, oh, for ages on the railroad, Garlock packing.

"Q: How often did you use that Garlock packing?

"A: Oh, almost every day that came into being. Yeah, either tightening up or renewing it. Sometimes, it was to a point where it was down so tight you had to take that apart and get the old packing out and put the new packing in and tighten it down.

"Q: What would happen when you took the old packing out, anything that would happen in the air? . . .

"A: Well, you couldn't help but knock pieces. You take it out piece by piece because it was dried out to a powder . . . ." (Videotape deposition of Gerard H. Ritter," pp. 35-36.)

While Mr. Ritter's testimony would establish that he worked with Garlock packing "almost every day that came into being" it does not establish whether dust was created simply by tightening bolts around the packing. Though Mr. Ritter testified that dust would sometimes be created by removing packing from the engines, no evidence was offered as to how frequently this would occur, or what percentage of Ritter's time was devoted to this task.

Mr. Ritter's testimony about his use of Garlock packing at his later Jersey City worksite is similarly vague as to the frequency and regularity of his exposure to asbestos dust for which Garlock is responsible. Ritter testified to using Garlock packing between 1964 and 1967:

"Q: Do you know what products you were using when you were working on steam generators?

"A: Well, it was, again, the coil pads and everything. The coil pads that was laying over the top of the coils. And the Garlock packing that went into the sides where the pipes used to go in. And there was—"(Videotape deposition of Gerard H. Ritter, p. 59.)

Notably, Mr. Ritter only testified to being exposed to Garlock products during five years of his 40-year work history.[2] Without evidence that addresses the frequency in

---

2. Mr. Ritter's deposition contains an inconsistent statement about his employment history that is likely the result of a transcription error

which Ritter came in contact with asbestos in its dust form, this court lacks sufficient evidence to make the determination that Ritter meets the proximity, frequency, and regularity requirements of Pennsylvania law, and, as such, that plaintiffs have established their prima facie case. As a result, summary judgment is appropriate to defendant Garlock.

## General Electric

Defendant General Electric argues that it is entitled to summary judgment on either of two alternate product identification grounds. First, GE argues that it is entitled to summary judgment solely on the inadmissibility of Mr. Ritter's deposition. Without that deposition, GE argues, plaintiffs have introduced no other evidence to carry their burden of proving a prima facie case. Additionally, GE argues that even if the deposition were admissible, its contents do not enable plaintiffs to meet the regularity, frequency, and proximity standards under the prevailing case law.

---

by the court reporter at his deposition. Ritter stated that from 1948-1950 he worked at the Scranton roundhouse with Garlock packing. Then, Mr. Ritter testified that from 1950-1961, he worked at the diesel electric shop and made no mention of Garlock products. Then, he testified that from 1961-1963, he worked at the Hornell facility. His employment testimony then states that he worked from 1946 to 1967 in Jersey City when he was unable to get work in Scranton. Importantly, he mentions working with Garlock packing during this time period. It seems likely, however, that this is a transcription error on the part of the court reporter, and that the correct time should be 1964. Mr. Ritter's subsequent employment, at McKinney Hinges from 1967-1970 and Consolidated Rail Corporation from 1970-1980 do not reference any exposure to Garlock products.

Plaintiffs have no credible argument that, without admission of Mr. Ritter's deposition, they should survive summary judgment. Even if Mr. Ritter's deposition were admitted, the testimony it contains fails to satisfy the regularity, frequency, and proximity requirements. Mr. Ritter stated that he worked with steam locomotives from 1948-1950, and that GE had manufactured at least 48 percent of the steam locomotives that he worked on. (Videotape deposition of Gerard H. Ritter, p. 26.) Ritter pointed to asbestos exposure on these steam locomotives through both boiler insulation and brake inspection. (*Id.,* pp. 26, 32-33.) Plaintiffs fail to address, however, significant problems with Mr. Ritter's testimony. Although plaintiffs latch on to the inference that since 48 percent of the locomotives were made by GE, 48 percent of Mr. Ritter's asbestos exposure must be likewise traceable to GE, this logic is without merit. In the aborted discovery deposition of GE, Mr. Ritter was asked about the age of the steam locomotives that he worked on:

"Q: What I'm getting at, were all of the steam locomotives that you can remember, say 10 years old or older when you got there?

"A: Yeah. Mostly all were. Yeah." (Videotape deposition of Gerard H. Ritter, p. 76.)

And, as Mr. Ritter also noted, the asbestos that insulated the boilers was replaced often:

"Q: This lagging on the exterior of the boilers, how often did that have to be replaced?

"A: Ordinarily, two years. They figured two years was about the life of it. It would come in every two years, it would be laid up for maybe three weeks or so, that they

would strip it down and rebuild it." (Videotape deposition of Gerard H. Ritter, p. 76.)

Further, Mr. Ritter could not identify the manufacturer of the asbestos-containing lagging that would be used with the GE locomotives:

"Q: You talked about steam locomotives back when you first began with the railroad and you were an apprentice machinist. And you talked about some insulation being used on the exterior of the boilers for the steam locomotives.

"A: Right.

"Q: Do you have any knowledge today as to who provided that to the railroad, who was the manufacturer of that insulation?

"A: No. No. Again, I'd say they brought all that from the main storehouse on a truck and no boxes around it or anything, just the lagging laying in strips on top of it. So I have no idea who manufactured it or where it came from." (Videotape deposition of Gerard H. Ritter, pp. 74-75.)

Plaintiffs next maintain that there is credible evidence of exposure to asbestos while at the diesel electric shop. Ritter testified that only GE and General Motors locomotives were present in that shop. (Videotape deposition of Gerard H. Ritter, p. 43.) This exposure to asbestos, according to Ritter, came from use of exhaust stack gaskets which sat between sections of the locomotive's exhaust stack. To identify these products as coming from GE and General Motors exclusively, Mr. Ritter testified that those companies were the exclusive manufacturer of this com-

ponent for their diesel electric locomotives. (*Id.,* p. 43.) However, Mr. Ritter's testimony fails to detail how frequently these gaskets needed to be changed, and how often Mr. Ritter performed the task. Without this information, this court lacks sufficient information to evaluate whether plaintiffs have met the frequency component of the applicable legal standard.

Lastly, plaintiffs claim that Mr. Ritter's deposition establishes exposure to asbestos contained in GE products while working at the Hornell facility in upstate New York. While Mr. Ritter testified that he worked on GE locomotives, the only asbestos he could confirm being exposed to was contained in brake shoes:

"Q: Do you know whether or not you were exposed to any asbestos-containing products while you were working in Hornell as an air brake mechanic? . . .

"A: Only thing was with the brake shoes." (Videotape deposition of Gerard H. Ritter, pp. 53-54.)

However, Mr. Ritter could not identify the manufacturer of those brake shoes:

"Q: Do you know the manufacturer or trade name of any suppliers of compound brake shoes for the steam locomotives?

"A: No, I don't." (Videotape deposition of Gerard H. Ritter, p. 47.)

In light of the foregoing, plaintiffs have failed to meet the regularity, proximity, and frequency requirements of a prima facie case, and, consequently, summary judgment as to defendant GE is proper. Defendant Viad raises similar claims in its motion for summary judgment.

*Viad*

Defendant Viad[3] argues that plaintiffs have not presented sufficient evidence to establish a prima facie case as to Viad. They argue that regardless of whether Mr. Ritter's deposition is admissible, plaintiffs have failed to make out a sufficient case to establish Viad's liability.

First, Viad argues that there is no credible rationale for the deposition testimony of Mr. Ritter to be admissible against Viad for not only those reasons discussed *supra,* but also because Viad was not added as a defendant until June 9, 2006. As a result, not only did Viad *not* participate in the Ritter deposition, it was not, nor should it have been, even on notice that it would be haled to court to defend this suit. This amplifies the inadmissibility of the deposition, without which, plaintiffs' claims against Viad must fail.

Notably, despite the fact that Viad's predecessor in interest, Baldwin Steam Locomotives, was a prominent manufacturer of steam locomotives on the east coast during the early 20th Centry, Baldwin is mentioned just once:

"Q: Could you tell us where the steam locomotives came from, do you know, who made them?

"A: Well, the steam locomotives, American Locomotive Company made an awful lot of our locomotives. And, General Electric, at that time, also made locomotives up in Schenectady, New York. And I did mention Baldwin before. Baldwin, down in Philadelphia. They

---

3. Viad is the successor in interest to Baldwin Steam Locomotives, a prominent manufacturer of steam locomotives at the time Mr. Ritter began working.

made some of our small—we call them mules. They were a small locomotive that used to couple to dead engines and move them about, to place them where they had to be." (Videotape deposition of Gerard H. Ritter, p. 26.)

This sole mention of Baldwin is patently insufficient evidence to allow the plaintiffs to maintain any claim against Viad. The fact that Mr. Ritter mentioned Baldwin in the deposition is, without more, insufficient to assess the frequency, proximity, and regularity of Mr. Ritter's exposure to asbestos for which Viad was responsible. Furthermore, as this court held in *Miletto v. CBS Corp.,* 2008 Phila. C.C.P. Lexis 920 (Phila. C.C.P. 2008), a piece of machinery is considered a separate and distinct thing from its insulation. The mere presence of Baldwin locomotives, therefore, does not equal the presence of Baldwin asbestos-containing materials. Moreover, Mr. Ritter never testified to working on Baldwin locomotives, *only to their presence.* Under the prevailing case law, plaintiffs are required to establish that Mr. Ritter regularly and frequently worked in close proximity to asbestos containing materials for which the defendant is responsible. As to defendant Viad, they have established exactly none of these elements. Therefore, in light of the foregoing, summary judgment as to defendant Viad is proper.

### III. CONCLUSION

In light of both the inadmissibility of Mr. Ritter's deposition, and the lack of evidence as to defendants Garlock, GE and Viad, summary judgment as to these defendants is appropriate and this court respectfully requests that it be affirmed.